# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50579

United States Court of Appeals
Fifth Circuit

**FILED**
September 8, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MANUEL GARCIA-MARTINES; MANUEL EDUWIGES RUIZ-SOLIS; ADELFO VIZCARRA-SERRANO; DELFINO BACA-TUPIA; PEDRO SAENZ-VIZCARRA; AVELINO BENITEZ-CEBALLOS,

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas
USDC No. 4:13-CR-631-1

Before JONES, SMITH, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Defendants Manuel Garcia-Martines ("Garcia"), Manuel Eduwiges Ruiz-Solis ("Ruiz"), Adelfo Vizcarra-Serrano ("Vizcarra"), Delfino Baca-Tapia[1] ("Baca"), Pedro Saenz-Vizcarra ("Saenz"), and Avelino Benitez-Caballos ("Benitez") were each charged with one count of possession of marijuana with

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Baca is named in the indictment as "Delfino Baca-Tupia." Delfino Baca-Tapia is the correct spelling and will be used throughout this opinion.

No. 14-50579

intent to distribute in violation of 21 U.S.C. § 841(a)(1) and aiding and abetting that offense in violation of  18 U.S.C. § 2.  All six defendants were found guilty after a three day jury trial.  All six appeal their convictions on the grounds of insufficient evidence.  Finding ample evidence in the record to support the jury's guilty verdicts, we affirm their convictions.

## I. Facts & Proceedings

This is an unusual but compelling circumstantial case of drug trafficking in the wilds of West Texas.  "We recite the facts in the light most favorable to the verdict." *United States v. Olis*, 429 F.3d 540, 541 n.1 (5th Cir. 2005).

At approximately 8:00 PM on November 14, 2013, Border Patrol sensor[2] activity was registered roughly five to six miles north of the border with Mexico in a known area of foot traffic and narcotics trafficking on the Vizcaino Ranch southwest of Marfa, Texas.  Agents from the Marfa Border Patrol office arrived to investigate several hours later at approximately 1:00 or 1:30 AM on November 15.  They found signs of foot traffic and fresh disturbances along a trail near the sensor.  Significantly, footprints on the ground bore several distinctive markings that agents described as resembling a "Christmas tree," "circles," or the "Atari" video game symbol.[3]  Agents recognized these symbols as those left by boots that are commonly used by "backpackers"[4] in drug trafficking organizations.  Agents initially estimated they were left by between

---

[2] These sensors are set up by Border Patrol agents in strategic locations where there is expected foot traffic.  Both human and animal traffic is capable of setting off the sensor. Agents also set up game cameras near the sensors to capture images of the foot traffic.

[3] Named after the company that produced classic video and arcade gaming systems in the 1970's and 1980's.  The company's first, and perhaps most famous game, was "Pong."  The symbol consists of three lines: a vertical line in the middle flanked on each side by half of an upside-down arch arching away from the vertical center line.

[4] In Border Patrol parlance, the term "backpackers" refers to groups of people transporting drugs or other contraband across the border.  The term "walkers" refers to illegal immigrants coming to the United States to look for work or permanently settle here.

four and five people traveling the trail, but later estimated it to be between four and six people. Agent Juan Flores also checked images left on a nearby game camera and saw images of backpackers carrying duffle bags on their backs. One of the photographs showed an individual hunched over as if the backpack was quite heavy. Agent Flores testified at trial that based on these images, the distinctive footprints, and his four-and-a-half years of Border Patrol experience he believed that agents were dealing with a group of backpackers transporting drugs.

By this time, it was light out and other agents arrived at the Vizcaino Ranch. They began "cutting sign"[5] by "leapfrogging."[6] This led the agents to the bottom of a mountain they call "the rim." Three agents, Agent Flores among them, began cutting sign up the side of the rim while two other agents looked for sign on the top. Agent Flores and other agents testified at trial that in their experience, backpackers tend to follow difficult routes like this – up the rim – to avoid detection, whereas walkers tend to follow easier routes – "the path[s] of least resistance."[7] Agents also called in a helicopter to help with their search.

---

[5] "Sign," by itself, refers to the footprints, tracks, and disturbances in ground vegetation left by walkers or backpackers. "Cutting sign," is the process by which agents track sign to find the walkers or backpackers who left it. In layman's terms, "cutting sign" is tracking or following a trail.

[6] A strategy where one agent follows the trail or cuts sign while another skips ahead to where the trail or sign is expected to lead. This is done to save time compared to cutting sign from where it begins to where it ends. *See also United States v. Hernandez-Bautista*, 293 F.3d 845, 848 (5th Cir. 2002) (describing "leapfrogging" as a "technique . . . to speed up the trailing process by looking for tracks ahead of the ones already found").

[7] Obviously, walkers seek to avoid detection as well since they are breaking U.S. immigration law by illegally crossing the border into this country. However, they are generally not as deceptive dond are more willing to give themselves up if in distress than backpackers, who are breaking not only U.S. immigration laws but narcotics trafficking laws as well.

No. 14-50579

While cutting sign up the side of the rim, Agent Flores looked back down to his right and suddenly saw four "bodies"[8] running in a single-file line down the rim.  The only distinguishing feature he could identify was that the last of the four bodies was wearing a gray hoodie or jacket.  He radioed to the helicopter, which had momentarily landed to save fuel, "[w]e got bodies running."  It got airborne and followed the bodies until the group split.  First the back person (the one wearing the gray hoodie) turned around and began running back up the rim.  Then the third-to-last split and ran up a hill to the east (left).  The agents in the helicopter decided to follow the remaining two bodies (the first two of the original single-file four) as they continued to run.  The two later surrendered with their hands up near an old windmill after being pursued by the helicopter for approximately two miles.  The chopper landed and an agent arrested the two, defendants Garcia and Vizcarra.  Agent Flores drove to their location and checked the soles of their boots.  Garcia's soles indicated the "Christmas tree" and Vizcarra's the "Atari."  Neither was in possession of a backpack, clothes, or water when arrested.  Both were wearing jackets.

The helicopter returned to the air and continued the search.  From the air, agents spotted a red "mochila"[9] on the ground approximately two miles from where Garcia and Vizcarra were arrested.  The red mochila had not been there the first time the helicopter flew over that location approximately 45

---

[8] This term is undefined in the record, but the context in which it is used throughout indicates it means "people" or "individuals."

[9] Mochila is the Spanish word for "backpack" and is used in Border Patrol parlance to refer to regular backpacks.  This is to be distinguished from the larger duffel bags, or "backpacks," used by backpackers to transport drugs.  Mochilas are carried by walkers and backpackers alike, though the contents of their mochilas generally vary.

4

minutes earlier.[10]  Agents in the helicopter also spotted indentations in the face of the rim that might have been a cave.  Other than apprehending Garcia and Vizcarra and seeing the mochila and a possible cave, agents did not find anything else that morning.

In the afternoon, agents returned to the area to search for narcotics on foot and by helicopter.  They observed partial sign in the area indicating unnatural movement and followed it to a large tree.  While there, the helicopter agents radioed to the ground agents to check for a possible cave nearby.  The ground agents cut more partial sign as they approached what turned out to be a previously undiscovered (by agents anyway) cave.  Agents found a tarp concealing two men in the cave with a third off to their left (the agents' right).  These three were defendants Ruiz, Baca, and Saenz.  They were arrested and taken into custody.

Each grabbed a mochila when agents instructed them to take their belongings.  The mochilas were full of food, but not clothing, personal hygiene items, identification, or other personal items.  There was testimony at trial that backpackers tend to carry very little in their mochilas besides food.  Walkers, on the other hand, are leaving their homes to resettle in this country.  They therefore carry personal items such as important phone numbers, family photos, mementos, hygiene items, changes of clothes, and identification in their mochilas.  In addition to food, Baca's mochila contained a roll of pink twine and a sewing needle that he told agents was for a tear in his shoes.  His shoes bore no indication of repair by pink twine, but they did indicate the "circle" design.  Ruiz's and Saenz's boot soles were imprinted with "Christmas

---

[10] Agents decided not to prioritize the red mochila.  They did not feel it was the type of bag that backpackers use to transport narcotics and that it would not be left out in the open where it could be spotted if it did in fact contain drugs.  Agents retrieved it several days later.

tree" signs.  Saenz was wearing a gray hoodie and Baca was wearing a jacket when they were arrested.

Agents returned later that night around 1:30 AM (technically the morning of November 16).  They found fresh sign and cut it to the cave, where they discovered defendant Benitez sleeping inside.  He had a mochila that contained only food and a pair of socks.  The soles of his boots had a "Christmas tree" symbol.  He was wearing a jacket.  He was arrested and taken into custody.

During the day on November 16, Agent Flores and others again returned to the area.  They discovered more sign and began cutting it toward the cave.  Before reaching it, Agent Flores spotted three green duffel bags around a bush covered by tree branches.  He found a fourth one about 150 yards away from these three bags, and other agents found two bags about 100 yards away from them.  A total of six bags were discovered, all within 200 to 300 yards of the cave.  Agents also saw sign about 50 yards from the location of the three bags, and disturbances in the grass (but no definite sign) right next to them.  The duffel bags appeared "fresh" and still smelled of marijuana.  The six bags contained a total of 311.95 pounds (141.5 kilograms) of marijuana packaged in individual bricks wrapped in brown cellophane.  Two of the duffel bags were sewn with pink twine.

Five of the six defendants (all except Benitez) spoke with Border Patrol agents after being read their rights (in Spanish) and stating they understood them and were willing to speak with agents.  Each told a similar story: that he was a construction worker from Chihuahua, Mexico who was driven to San Antonio del Bravo, Mexico in a pickup truck[11] and crossed the border looking

---

[11] There were some different recollections of the make and color of the pickup truck, and whether the defendants paid anybody to drive them from Chihuahua.  Such differences are irrelevant to the case.

for work in the United States. All denied knowledge of the marijuana. Garcia admitted that he was one of the bodies who ran from the cave when the helicopter flew over. Vizcarra said he had a red backpack, but lost it while running from Border Patrol. Saenz admitted that he ran from the helicopter and later returned to the cave. He also admitted that the gray hoodie was his. Each claimed to be a walker, not a backpacker.

The six defendants were indicted on December 12, 2013 and each was charged with one count of possession of marijuana with intent to distribute and aiding and abetting. A three day jury trial ensued. The defendants filed a Rule 29 motion for judgment of acquittal at the close of the Government's case-in-chief, which the district court denied.

Two defendants testified for the defense at trial. Vizcarra testified to traveling with Garcia across the border. He testified that he wanted to come to the United States to live and work in Oklahoma. He admitted to running from the helicopter and identified Garcia as the man arrested with him. On cross-examination by the Government, he admitted telling agents he lost a backpack, but denied telling them that it was red.

Baca also testified at trial. He testified that he was carrying a small backpack, but could carry no more than 15 kilograms (33 pounds) due to a shoulder injury. He confirmed that he was traveling with Saenz and Ruiz prior to his arrest when they happened upon the cave. He claimed he found the spool of pink twine in the cave and thought it would be useful to repair his shoes. On cross-examination, he admitted that the pink twine in his bag resembled the pink twine sewn on two of the six duffel bags full of marijuana.

All six of the defendants were found guilty by the jury and were sentenced to between 60 and 63 months, plus five years of supervised release. They all filed timely appeals to this court.

No. 14-50579

## II. Discussion

Each defendant contends on appeal that the evidence presented at trial was insufficient for a rational jury to have found him guilty. "This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). We must therefore "review[] the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)). "We do not evaluate whether the jury's verdict was correct, but rather, whether the jury's decision was rational." *United States v. Miles*, 360 F.3d 472, 477 (5th Cir. 2004) (internal citation omitted).[12] "A conviction for the offense of possession of marijuana with intent to distribute requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute it." *United States v. Cano-Guel*, 167 F.3d 900, 904 (5th Cir. 1999) (internal citation omitted). To aid and abet an offense, the Government must show that the elements of the substantive offense occurred and that the defendant associated with the criminal activity, participated in it, and acted to help it succeed. *United States v. Pringler*, 765 F.3d 445, 449 (5th Cir. 2014). Applying these standards to the evidence in the record, we have little trouble concluding that a jury could have rationally found all of the defendants guilty of the crimes charged beyond a reasonable doubt.

All of the defendants' principal contention is that there is only circumstantial evidence connecting them to the marijuana. None of the

---

[12] We also reiterate that this court no longer adheres to the so-called "equipoise rule," which would require this court to reverse a conviction if the evidence construed in favor of the verdict provides equal or nearly equal circumstantial support of guilt or innocence.

defendants were arrested with marijuana on his person and there was no evidence that any of them had been in contact with the marijuana. This argument overlooks that the jury heard evidence that backpackers stash or hide their bags of drugs when they sleep precisely for this reason; agents find either the drugs or the bodies, but do not find them together. It also overlooks established law in this circuit that properly evaluated circumstantial evidence "is as reliable and trustworthy as a means of proving guilt as direct evidence." *Thurmond v. United States*, 377 F.2d 448, 450 (5th Cir. 1967). The jury was instructed that the law makes no distinction between the weight the jury may give to direct and circumstantial evidence. Moreover, there are myriad additional circumstances supporting a rational inference of guilt. "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990).

To begin with, agents saw fresh sign in a known drug trafficking area left by a group of four to six people,[13] all wearing boots with distinctive soles that left "Christmas tree," "circles," or "Atari" sign on the ground. There was testimony from Border Patrol agents that walkers tend to wear sports shoes or

---

*Vargas-Ocampo*, 747 F.3d at 300-02. Several of the defendants' briefs cite the equipoise rule and our prior cases. To be clear, an en banc decision of "this court abandon[ed] any reliance on the equipoise rule" in *Vargas-Ocampo*. *Id.* at 303 (internal quotations omitted). Cases cited by defendants to the contrary are no longer the law in this circuit. *E.g.*, *United States v. Gonzalez*, 436 F.3d 560, 571 (5th Cir. 2006); *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998); *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996); *see also Vargas-Ocampo*, 747 F.3d at 301 n.2 (collecting cases that were abrogated because they applied the equipoise rule).

[13] Benitez emphasizes testimony that agents believed they were initially tracking only four or five backpackers and argues that he had the fortune of being the sixth person arrested. The jury also heard testimony that agents later believed they were tracking four to six backpackers from which it would be rational to conclude that he was among the group that left the sign.

tennis shoes of all different kinds whereas drug trafficking organizations purchase boots with these soles for each of their backpackers in order to confuse agents tracking them. All of the defendants were arrested wearing such boots, and four of the six defendants (Garcia, Ruiz, Vizcarra, and Saenz) wore the boots that left the "Christmas tree" sign. Some of the defendants take issue that the agents did not measure the footprints left on the ground in order to confirm they were the same size as the boots worn by the defendants. This was not necessary for a jury to have concluded rationally that the defendants left the sign.

The marijuana was recovered in the vicinity of a cave that all of the defendants were either arrested in, seen near, or admitted to being in. Agents cut sign straight from where the sensors were activated to the rim and the cave. Agents testified that there was no other human sign in the area and that walkers would not tend to follow such a difficult route up the side of the rim to the cave. The cave was not easily accessible, and not even agents knew of its existence before this case arose. While it is certainly possible, as defendants argue, that all of the defendants coincidentally happened upon the same remote cave while traveling illegally across the border as mere walkers, it was rational for the jury to conclude otherwise.

Six duffel bags of marijuana were recovered and six defendants were arrested. Defendants argue that there was no fingerprint or DNA evidence linking them to the duffel bags, but forensic evidence is not required to establish a link. There was testimony that the duffel bags were of a type used by backpackers in drug trafficking organizations. Images recovered by Agent Flores from the game camera showed men carrying heavy duffel bags that

matched the type that were ultimately found.[14]  Two of the six bags had pink twine on them that Baca admitted matched what he carried in his mochila.

Defendants argue that a lack of evidence of strap marks on their shoulders indicates that they were not the individuals carrying the heavy duffel bags.  This argument ignores testimony that these strap marks would not be left if the defendants were wearing jackets or layers of clothing.  Five of the six defendants (all but Vizcarra) were in fact wearing jackets when taken into custody.[15]  Moreover, there was testimony that any marks would generally subside once the duffel bag was off for several hours.

On the subject of backpacks, defendants carried mostly food in their mochilas.  The jury heard that backpackers tend to carry only food, whereas walkers tend to carry other items and personal effects. Vizcarra told agents that he lost a red mochila while running from Border Patrol.  A red mochila that was not there when the helicopter first passed over (before it chased Garcia and Vizcarra) was found near where the drugs were located.

The colloquy of circumstances in this case is compelling.  In the end, defendants' arguments on appeal mainly provide alternative explanations for the evidence presented.  But it was the jury's role to weigh these arguments and make its own factual determinations.  *See United States v. Delgado*, 668 F.3d 219, 225 (5th Cir. 2012) ("The jury is free to choose among reasonable

---

[14] Baca testified at trial that he could carry no more than 15 kilograms (33 pounds) due to a preexisting shoulder injury.  There were 141.5 kilograms (311.95 pounds) of marijuana recovered in the six bags, meaning that the average weight per bag was roughly 23.5 kilograms (52 pounds).  From this, he argues that he could not have been one of the backpackers carrying the drugs.  Even if the jury chose to believe he had an injury, it still heard Agent Flores's testimony and saw the image of the man hunched over carrying a heavy bag.  It would have been rational for the jury to conclude that Baca carried all that he could with his injury and the body in the image picked up the slack.

[15] Saenz was even arrested in and admitted to owning a gray hoodie.  Agent Flores testified that he saw the last of the four single-file runners wearing a gray hoodie.

No. 14-50579

constructions of the evidence and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." (internal quotations and citations omitted)). Having done so, the jury reached a rational finding of guilt of the crimes charged.  All of the defendants' convictions are therefore **AFFIRMED**.