IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-50028

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

CARL V. HERRERA,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, BARKSDALE, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A jury found Carl Herrera guilty of tax evasion. The district court granted Herrera's motion for judgment of acquittal and conditionally granted his request for a new trial. The government appeals both orders. We reverse the judgment of acquittal, affirm the grant of a new trial, and remand.

I.

Herrera, a native of Venezuela, had attended college in Houston and moved back to the United States in 1991 to play professional basketball for the Houston Rockets. Because of injuries, he was traded from team to team until his NBA career ended in 1999. The next year, after having been married and divorced, he married his longtime girlfriend. Unable to find work in America, he returned home to play in Venezuela, leaving his new wife, four children, and ailing parents behind.

From 1994 to 1997, Herrera failed to file any tax returns. The IRS initiated an investigation in 1998, and by 1999 he admitted to owing over $500,000 in delinquent taxes. Collection efforts began in February 2000 but were mostly unsuccessful.

The IRS decided to prosecute. At trial, the government focused on three acts that allegedly demonstrate Herrera attempted to avoid payment of taxes. First, money in Herrera's bank accounts was transferred to his wife's accounts. The government contends that Herrera was shifting funds to avoid IRS levies. Second, in January 2001 Herrera transferred his San Antonio house to his wife's sole ownership using a quitclaim deed, allegedly to avoid a tax lien. Finally, Herrera provided inaccurate information to the IRS during a 2006 meeting, allegedly trying to understate his income.

Although Herrera did not contest the factual basis of the allegations or the existence of a tax deficiency, he provided benign explanations. Regarding the money transfers, he explained that the funds were sent to support his wife, children, and parents back in America. He further stated that all of his finances were managed by other people, so he was not personally responsible for the transfers. Regarding the quitclaim deed, he explained that the mortgage com-

2

pany often refused to deal with his wife, because her name was not on the deed. He therefore transferred the house to her so that she could handle the mortgage while he was out of the country. Finally, he explained that any inaccurate information was not a willful misrepresentation but only a mistake that reflected his lack of familiarity with his financesSSanother result of relying on financial managers.

## II.

We review a judgment of acquittal de novo, applying the same standard as did the district court. United States v. Loe, 262 F.3d 427, 432 (5th Cir. 2001). "That standard asks whether a reasonable jury could conclude that the relevant evidence, direct or circumstantial, established all of the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the verdict." Id.

Tax evasion, defined in 26 U.S.C. § 7201,[1] requires proof beyond a reasonable doubt of "(1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting evasion or attempted evasion of the tax." United States v. Bishop, 264 F.3d 535, 545 (5th Cir. 2001). "Willfulness" is the "voluntary, intentional violation of a known legal duty." Cheek v. United States, 498 U.S. 192, 201 (1991) (internal quotation marks omitted).

Because Herrera does not appeal the deficiency itself, we consider only

---

[1] "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution." 26 U.S.C. § 7201.

whether the government presented sufficient evidence that he willfully attempted to avoid his tax payment. To prevail, the government need only demonstrate that the jury could have convicted based on at least one of the three alleged affirmative actsSSi.e., the shifting of funds, the house transfer, or the inaccurate interview statements.[2]

## A.

The government alleged that Herrera attempted to conceal funds by shifting them from his bank accounts. From 1999 through 2000, most of Herrera's money was deposited into seven accounts registered in his name or the name Cahrrera Media International, a company he owned. After a warning in 2000 that the IRS was going to begin collection efforts, including levying on bank accounts, most of Herrera's money was deposited into accounts in his wife's name. The government avers that a reasonable juror could infer that Herrera willfully shifted funds to evade the levies.

The district court determined that the government's evidence was insufficient in three respects. First, the government did not adequately demonstrate that Herrera exercised any control over where the deposits were made and so could not have acted willfully. Second, there was not enough evidence that he had contact with the bank accounts attributed to him. Finally, there was no evidence that even if he made the transfers, he did so with the specific intent to evade taxes. The theme of all three objections is that Herrera relied on others to manage his financial affairs and so was not responsible for the pattern of de-

---

[2] See United States v. Mackey, 571 F.2d 376, 387 (7th Cir. 1978) ("[T]he prosecution must prove some affirmative act . . . . However, the prosecution need not prove each affirmative act alleged.").

posits.

We agree with the district court. Although the government presented enough evidence for a jury to conclude that Herrera had contact with the accountsSSe.g., he called to complain to the IRS when $200 was deducted from one of themSSthe government did not demonstrate that he exercised any control over his finances. On cross-examination, the government witness admitted that none of the deposit checks was signed by Herrera. Further, his wife testified that when she needed money, she would call Herrera's financial advisor, who was co-named on all of the accounts, not Herrera. Without evidence that Herrera orchestrated the transfers, a reasonable juror could not find beyond a reasonable doubt that he willfully shifted funds to avoid paying taxes.

## B.

The government contends that Herrera transferred his San Antonio house to his wife by quitclaim deed to evade the IRS's attempts to seize it. As further evidence of an intent to evade, the government claims that he gave the IRS different and conflicting explanations for the transfer. Herrera responded with evidence that the mortgage company refused to communicate with his wife about the mortgage, because her name was not on the deed, so he transferred the house to enable her to manage his affairs while he was in Venezuela.

The district court concluded that the evidence was insufficient. First, the court found that the quitclaim contracts were prepared before the IRS had given Herrera notice of the lien on the house, and he could not have been trying to avoid a lien he did not know about. Second, the court found that the inconsistencies between his explanations were "not substantial enough to prove beyond a reasonable doubt that Herrera transferred title into his wife's name to 'hide' his

assets and evade the payment of a tax."

We conclude differently. It is true that Herrera did not receive notice of the lien until after the quitclaim was prepared, but he had been warned six months earlier that such a lien could be instituted. He claims that the six-month gap attenuates any connection, but "faced with a record of historical facts that supports conflicting inferences [, we] must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and [we] must defer to that resolution." Wright v. West, 505 U.S. 277, 296-97 (1992) (citation and internal quotation marks omitted).

Although we agree with the district court that the inconsistencies in Herrera's story are not significant,[3] the explanations for the quitclaim do not line up with the circumstances surrounding its execution. First, despite Herrera's claim that he transferred title so his wife could talk to the mortgage company, neither of them ever informed the company of the transfer. Second, an employee of the mortgage company testified that Herrera did not need to use a quitclaim to authorize his wife to discuss the mortgage; the company accepts written or verbal authorization and in fact had a record of Herrera's giving verbal authorization. The employee further testified that, even where a quitclaim is used, the new deed must contain the names of both parties. Herrera quitclaimed the house from his sole ownership to his wife's sole ownership, a transfer the mortgage company would not have accepted.

Herrera responds that he intended for both names to be on the deed and

---

[3] In all versions of the story, parties were refusing to communicate with Herrera's wife about the mortgage. The inconsistencies are merely whether the quitclaim was Herrera's idea or his wife's and whether the transfer was to enable her to talk to the IRS or the mortgage company. Those are minor discrepancies and do not demonstrate intent to evade taxes.

speculates that this was a "miscommunication" with the attorney who prepared the documents. And his wife testified that she did not send the mortgage company copies of the updated deed, because they started communicating with her. Those explanations are plausible but, viewed in the light most favorable to the verdict, do not justify acquittal. The jury reasonably could have disbelieved the wife's testimony and concluded, based on the timing and circumstances surrounding the quitclaim, that Herrera transferred the house to avoid the IRS's collection efforts.[4]

## C.

The government contends that, in a 2006 interview with the IRS, Herrera made various false statements about his financial situation. For example, the IRS asked him about his year 2000 income, and he stated that he had made only $8,000 playing basketball and received a $15,000 loan from a friend. Yet the IRS produced records showing over $275,000 deposited into Herrera's accounts that year, which he was unable to explain. There were similar discrepancies between Herrera's self-reported income and deposit records for 2001 and 2002.

The district court viewed the evidence as not adequately demonstrating willfulness or a specific intent to avoid paying taxes. First, the court found that Herrera was not intentionally lying but instead was just unable to answer detailed financial questions. The court noted that Herrera was unfamiliar with his finances, because he relied on others to manage them and did not have financial records to reference during the meeting. Second, the court stated that Herrera's

---

[4] See Loe, 262 F.3d at 432 ("A jury is free to choose among reasonable constructions of the evidence[, a]nd it retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." (internal citations and quotation marks omitted)).

answers could not have been an attempt to avoid paying taxes, because he was answering questions about his 1999-2002 financial circumstances, not his current resources. The court reasoned that "[i]t is unclear how a 'false statement' in 2006, about Herrera's financial situation in 2001, relates to an affirmative act in 2006 of evading the payment of a tax due and owed."

We disagree. To begin with, the meeting was not a casual one; the IRS emphasized in advance that Herrera was about to be charged with a criminal offense, that he should have a lawyer present, and that any statements he made would be used against him at trial. Further, the degree of error was significant: Herrera reported at most $23,000 of income in a year in which he apparently received over $275,000. Although it is plausible that his incorrect answers merely reflected ignorance, it was the jury's prerogative to weigh the evidence and find otherwise. Moreover, the jury could have reasonably inferred that Herrera lied about his prior income to deter the IRS from pursuing further collection efforts.

## D.

In summary, the evidence presented at trial was sufficient to convict Herrera on the basis of two out of the three affirmative acts alleged by the government. The district court therefore erred in ordering acquittal, because the jury reasonably could have concluded that Herrera transferred his house to avoid an IRS lien and/or lied to IRS agents about past income to deter them from pursuing further collection efforts.

## III.

We review for abuse of discretion the conditional grant of a new trial. United States v. Robertson, 110 F.3d 1113, 1116 (5th Cir. 1997). "In determining

whether to grant the motion, the district court must carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial, but must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate." United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005) (internal citations and quotation marks omitted). "Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances where the evidence brought forth at trial may tangentially support a guilty verdict, but in actuality, 'preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred.'" Id. (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

The district court was within its discretion in conditionally granting a new trial. Although the evidence is sufficient to support a conviction, the court cautiously reweighed it and found it preponderated heavily against the guilty verdict. In doing so, "the court sits as a thirteenth juror." Robertson, 110 F.3d at 1120 n.11.

We therefore REVERSE the judgment of acquittal, AFFIRM the conditional grant of a new trial, and REMAND.