# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 3, 2023

Lyle W. Cayce
Clerk

_____

No. 20-20094

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Carmen Saldana Meyer,

*Defendant—Appellant*,

consolidated with

_____

No. 20-20584

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Daniel Polanco

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:15-CR-544-11,
4:15-CR-544-12

_____

No. 20-20094
c/w No. 20-20584

Before Wiener, Higginson, and Wilson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

In 2019, after a nine-day jury trial, Defendant-Appellants Carmen Saldana Meyer and Daniel Polanco were convicted on several counts related to their involvement in a drug trafficking organization. On appeal, Meyer challenges only her kidnapping conviction while Polanco raises several challenges to each of his convictions. For the reasons given below, we AFFIRM.

## I. Facts and Proceedings

The case against both Carmen Saldana Meyer and Daniel Polanco began with an investigation into a drug trafficking organization ("DTO") responsible for transporting narcotics, primarily cocaine but also including methamphetamine and marijuana, from Mexico into the United States. Through that investigation, law enforcement officers learned that members of the DTO (the "conspirators") were stealing shipments of drugs from the original suppliers.

The scheme operated as follows. The conspirators would enter into a contract to transfer drugs for a supplier. After accepting the drugs, the conspirators would replace the real drug load with a "sham" load containing only small or trace amounts of the drug, just enough for the sham load to pass as real drugs on a field test. Working with corrupt law enforcement officers, the conspirators would stage seizures of the sham bundles by law enforcement. Later, the corrupt officers would provide the official seizure paperwork to the conspirators to show to the suppliers as proof the drugs had been seized. With the theft of the drugs covered up, the conspirators would sell the stolen drugs at a profit.

This investigation eventually culminated in a Superseding Indictment against 17 co-conspirators. Three defendants—Carmen Meyer; Daniel Polanco, a Border Patrol agent; and Hector Beltran, a police officer with

2

Texas's Edinburg Police Department—proceeded to a joint jury trial. The jury trial lasted nine days, during which the jury heard from thirty-six witnesses (thirty presented by the Government, six by the three defendants).

Both Meyer and Polanco were convicted on all counts.[1] Specifically, the jury found both Meyer and Polanco guilty of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). In addition, the jury found Meyer guilty of kidnapping in violation of 18 U.S.C. § 1201(a)(1), and Polanco guilty of giving a false statement to a government agent in violation of 18 U.S.C. § 1001(a)(2).

Below, we briefly provide an overview of the facts underlying Meyer's and Polanco's convictions as supported by the evidence and testimony presented at trial.

## A. Carmen Saldana Meyer

Meyer, a paralegal from McAllen, Texas, aided the conspiracy by serving as a liaison between the drug suppliers and the conspirators.[2] Specifically, Meyer would turn over police reports to the suppliers indicating that their drug shipment had been seized by police. In reality, these were staged seizures, and the real drugs were sold by the conspirators.

Meyer was recruited into the scheme by Maritssa Salinas. Salinas was friends with Carlos Aaron Oyervides and Dimas DeLeon (the main conspirators) and had been in a romantic relationship with Francisco Arismendez (a drug supplier). In April 2013, Arismendez (who also went by

---

[1] Beltran was convicted on one count of conspiracy to possess with intent to distribute cocaine and acquitted on two counts of possession with intent to distribute a controlled substance. Although Beltran appealed his conviction, his appeal was dismissed for want of prosecution.

[2] On appeal, Meyer does not challenge any of her convictions related to the drug conspiracy. Instead, she challenges only her kidnapping conviction. Accordingly, we address only the facts relevant to that conviction.

"Poncho") hired Oyervides and DeLeon to sell around 20 kilograms of cocaine. Rather than sell the cocaine, however, Oyervides and DeLeon stole the drugs and covered it up with a staged seizure in Houston, Texas. After the seizure, DeLeon created fake police documents to serve as proof of seizure. Oyervides gave these documents to Salinas, who in turn gave the documents to Meyer to give to Arismendez and his associate, a man known as "Alex."

In November 2013, Oyervides traveled to Mexico to discuss a new deal to transport drugs for Arismendez. At trial, the Government argued and introduced evidence to support that Oyervides traveled to Mexico on Meyer's invitation, and that Meyer had informed Arismendez (who had grown suspicious about the seizure in Houston) about the thefts by the time Oyervides was asked to cross the border.[3] While leaving the meeting in Mexico, Oyervides was kidnapped at gunpoint. Oyervides, who was held captive for four-and-a-half-months, was ultimately rescued by the Mexican military.

## B. Daniel Polanco

In 2013, Daniel Polanco was working as a Border Patrol agent. As argued by the Government at trial, he aided the conspiracy by serving as one of the corrupt officers who would help stage seizures of sham drugs and then gave a false statement to federal agents to help hide his involvement in this conspiracy.

On April 20, 2013, Polanco (who was off duty) called a friend, Juan Balderas, who was an officer with the Edinburg Police Department, to report a suspicious vehicle parked off a highway. According to Balderas, Polanco

---

[3] At trial, Meyer denied telling Arismendez about the thefts in advance of the kidnapping and testified that Salinas, not her, had set up the meeting in Mexico.

explained that a backpacker[4] who had been apprehended by Border Patrol earlier that week had told Polanco that a car, specifically a green, four-door Mazda, used for drug trafficking would be stationed at the intersection of Davis and Highway 281. Polanco noted that he happened to be driving up to San Antonio with a woman named Monica and had just seen a car matching the description provided by the backpacker parked at that location.

Law enforcement responded to Polanco's call and recovered packages of what appeared to be narcotics from inside the vehicle. The packages tested positive on the field test for narcotics, and later testing revealed that the packages contained trace amounts of cocaine.

Balderas testified that Polanco called that afternoon and asked if Balderas could send over a photo of the narcotics recovered from the car. Balderas sent over the photos.

Soon after the vehicle was seized, law enforcement began asking follow-up questions as to the circumstances surrounding Polanco's report. On April 23, 2013, Balderas was asked to produce a written report about the information he had received about the vehicle. According to Balderas, he gave Polanco the heads-up about the report. At some point, Polanco called Balderas and requested a copy of that report. Polanco, Balderas testified, claimed that he needed a copy because he had also been asked to do a report for his own supervisors.

Indeed, Polanco's shift supervisor, Donicio Diaz, had been asked to conduct a follow-up interview with Polanco to learn more about how Polanco had received the information he had conveyed to other law enforcement agencies. On April 23, 2013, Diaz conducted his first follow-up interview. In that interview, Polanco explained that a backpacker picked up by Border Patrol had informed him that drug traffickers were using small-sized vehicles

---

[4] A backpacker is a mule, that is, someone carrying narcotics in a duffel bag, backpack, or other container.

staged alongside roads. Thus, when Polanco (who was driving up to see a fight in San Antonio), saw a vehicle that he "knew" near a tractor trailer, he called it in. The next day, on April 24, 2013, Diaz conducted a second interview with Polanco. During the interview, Polanco could not provide any more detail as to the tractor trailer (which he clarified was parked further down the road) but did note that the small car was a green or aqua Nissan with no license plates and a "jacked up" rear. Diaz, who did not interview Polanco again, noted that Polanco did ask a few more times if there had been any more questions or if anything had come from the investigation.

Later, in May 2013, Polanco was called in for an interview with DEA Agent Anthony R. Santos. In that interview, Polanco denied receiving any specific information about a car used for drug trafficking from a backpacker, but instead had learned from the backpacker that drug traffickers had generally been staging vehicles in abandoned locations. Polanco indicated that he had just had a "hunch" about the vehicle, based generally on his experience as a Border Patrol agent.

At trial, Polanco maintained that he had called in the vehicle based on information received from the backpacker and the knowledge he had obtained while working as a Border Patrol agent. The Government, however, contended that Polanco had worked with DeLeon, one of the primary conspirators, to stage this seizure. The evidence presented by each side in support of its version of events will be discussed in greater detail below in connection with Polanco's challenge to the sufficiency of the evidence as to his convictions.

## II. Discussion

### A. Meyer's Issues on Appeal

On appeal, Meyer raises two issues: (1) whether the district court improperly instructed the jury as to the kidnapping charge and (2) whether the evidence was sufficient to support her conviction of the kidnapping offense. We address each in turn.

1. Jury Instruction

Meyer first argues that the district court erred in instructing the jury on the federal kidnapping charge. Where a party did not object to the jury instructions before the district court, we review for plain error.[5] *United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001). "A jury instruction is plain error if (1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant." *United States v. Percel*, 553 F.3d 903, 909 (5th Cir. 2008) (internal quotation marks and citation omitted). If these three conditions are met, we will use our discretion to correct the error if it "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings." *Daniels*, 252 F.3d at 414 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

Here, Meyer contends that the district court failed to properly instruct the jury as to all the statutory elements required for a federal kidnapping offense under 18 U.S.C § 1201(a)(1). The jury charge instruction on the kidnapping count read as follows:

> For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:
>
> > *First*: That the defendant, knowingly acting contrary to law, kidnapped, seized or inveigled Carlos Aaron Oyervides;
> >
> > *Second*: That the defendant held Carlos Aaron Oyervides for ransom, reward or some purpose or benefit; and
> >
> > *Third*: That the defendant traveled in interstate or foreign commerce, that is from Hidalgo County, Texas to the United Mexican States.

---

[5] Meyer concedes that she did not object to the kidnapping jury charge instruction at trial.

Meyer takes issue only with the third instruction, which addresses the statute's jurisdictional element.

Meyer's primary argument on appeal is that that the jurisdictional element of the federal kidnapping statute cannot be satisfied by the *defendant's* travel in interstate or foreign commerce; rather, Meyer claims, the government must show that the *victim* was transported in interstate or foreign commerce. Yet in so arguing, Meyer ignores that, in 2006, the statute was amended to allow the government to establish jurisdiction by the offender's travel. *See* Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 213, 120 Stat. 587, 616 (codified at 18 U.S.C. § 1201(a)(1)). Now, the federal kidnapping statute reads as follows:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when . . . the person is willfully transported in interstate or foreign commerce . . . *or the offender travels in interstate or foreign commerce* or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce *in committing or in furtherance of the commission of the offense* . . . shall be punished by imprisonment for any term of years or for life . . . .

18 U.S.C. § 1201(a) (emphasis added). It was therefore not error for the district court to instruct the jury that the offender's own interstate or foreign travel could supply the jurisdictional hook.

However, in instructing the jury, the district court did not clarify that the offender's travel must be "in committing or in furtherance of the commission of the offense." At oral argument, the Government conceded that this failure was error. *See also* Fifth Circuit Pattern Jury Instructions (Criminal) § 2.54 (2019) (stating that the jurisdictional element can be met if "the defendant traveled in interstate or foreign

commerce *in committing or in furtherance of the commission of the offense*"
(emphasis added)).[6]

Nonetheless, we find that this error does not warrant a plain error
reversal. At trial, the Government argued (and produced evidence
supporting the conclusion) that Meyer traveled to Mexico to make Oyervides
feel comfortable attending the meeting with Arismendez. And while Meyer
disputes that the jury could have found that she had the requisite intent in
traveling to Mexico, she does not contest that the Government's theory of
the case, and its trial proof, always connected her travel to the kidnapping.
Accordingly, although we hold that the district court committed error in
instructing the jury as to the kidnapping count, such error does not rise to
plain error.

### 2. Sufficiency of the Evidence

Next, Meyer argues that the evidence was insufficient to support her
kidnapping conviction. We review the denial of a motion for acquittal based
on insufficient evidence *de novo*. *United States v. Reed*, 908 F.3d 102, 123 (5th

---

[6] On our review of the record on appeal, we note that, without contemporaneous
objection or identification on appeal as an issue from the parties, the substantive offense
instructions were not orally read to the jury. Reviewing Federal Rule of Criminal Procedure
30, we see no explicit directive that jury instructions be given orally. *See* FED. R. CRIM.
P. 30(c) (noting that the court "may *instruct* the jury" either before or after arguments
without providing any definition of what it means to "instruct" a jury). Although we do
not find precedent addressing this issue from our own court, sister circuits have recognized
the necessity of providing oral instruction. *See United States v. Becerra*, 939 F.3d 995, 998,
1001 (9th Cir. 2019) (describing why "the historic practice of oral jury instruction remains
central to the fairness of jury trials" and noting that "[a] trial court does not satisfy its duty
to instruct jurors in a criminal case just by providing those jurors with a set of written
instructions to use during deliberations"); *see also United States v. Noble*, 155 F.2d 315, 318
(3d Cir. 1946) (holding that it is "essential that all instructions to the jury be given by the
trial judge orally in the presence of counsel and the defendant" and concluding that the
failure to do so is error). In light of the absence of any argument from either party in the
district court or before us on this issue, we note only that had the trial court here read the
substantive offense instructions aloud, it is likely that this error would have been caught
contemporaneously.

Cir. 2018). In conducting this review, we do "not evaluate the weight of the evidence or the credibility of witnesses," *United States v. Doggins*, 633 F.3d 379, 383 (5th Cir. 2011), and we "will affirm if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict."[7] *Reed*, 908 F.3d at 123 (internal quotation marks and citation omitted). In other words, "[o]ur question is whether the jury's verdict was reasonable, not whether we believe it to be correct." *United States v. Bolton*, 908 F.3d 75, 89 (5th Cir. 2018) (internal quotation marks and citation omitted).

Meyer contends that the evidence was not sufficient for the jury to find that she had advance knowledge of and assisted in any way with the kidnapping and, therefore, a reasonable jury could not have concluded that Meyer inveigled Oyervides and traveled to Mexico in furtherance of the crime.[8]

At trial, however, the Government produced evidence demonstrating that Meyer had played an integral role in arranging this kidnapping. This evidence primarily consisted of testimony from Oyervides and Maritssa Salinas, both of whom were indicted co-conspirators who, at the time of trial, had pleaded guilty, and Antonio Perez, IV, an agent with Homeland Security

---

[7] Citing *United States v. Gonzales*, 436 F.3d 560 (5th Cir. 2006), Meyer advocates for the use of the so-called equipoise rule, which states that "[i]f the evidence tends to give nearly equal circumstantial support to either guilt or innocence then reversal is required." *Id.* at 571. But we expressly "abandon[ed] use of the 'equipoise rule'" in *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc). *See also United States v. Garcia-Martines*, 624 F. App'x 874, 879 n.12 (5th Cir. 2015) (reiterating that *Vargas-Ocampo* prohibits the use of the equipoise rule).

[8] Meyer also argues that the evidence was not sufficient for a jury to find that Oyervides, the victim, was unwillingly transported in interstate or foreign commerce. As already discussed, this argument ignores that the federal kidnapping statute now includes the defendant's own travel as a basis for jurisdiction.

Investigations ("HSI"), who interviewed Meyer in connection with the kidnapping.

Testimony from Oyervides indicated that Meyer initiated the meeting with Arismendez, and testimony from Salinas indicated that Meyer traveled to Mexico to help make Oyervides feel comfortable attending the meeting—in the past, Oyervides had experienced issues with his passport, and wanted Meyer with him in case he encountered difficulty at the border. And, critically, Perez testified that Meyer herself admitted that she had lured Oyervides to Mexico with the false promise of a new drug deal on Arismendez's orders.

Both Oyervides and Salinas also testified to interactions after the abduction which further suggested Meyer's guilt. Oyervides testified that Arismendez and Alex told him that Meyer had informed them that he had stolen merchandise, and that "she had put [him] there." Oyervides also testified that he had overhead a conversation in which Meyer suggested that Arismendez and Alex kill him. Similarly, Salinas testified that she barely escaped abduction herself, and was only able to escape thanks to the intervention of Arismendez, her ex-boyfriend. Yet in a conversation with Meyer immediately following the attempted kidnapping, as Salinas attempted to flee to safety in the United States, Meyer acted as though nothing had happened and urged Salinas to come back to Mexico. Moreover, Salinas testified that in a phone call between Meyer, Salinas, Arismendez, and Alex at some point after the kidnapping, Alex threatened Salinas for being involved with the drug thefts while thanking Meyer "for everything."

Put simply, this evidence was sufficient for a jury to conclude that Meyer inveigled Oyervides to travel to Mexico and that Meyer had traveled to Mexico in furtherance of the kidnapping.

### B. Polanco's Issues on Appeal

On appeal, Polanco raises four issues: (1) whether the evidence was sufficient to support his conviction on all three counts, (2) whether the

district court abused its discretion in denying his motion for a new trial, (3) whether the district abused its discretion in admitting evidence of an assault pursuant to Federal Rule of Evidence 404(b), and (4) whether the district court's rulings at trial violated Polanco's Confrontation Clause rights. We address each in turn.

## 1. Sufficiency of the Evidence

Polanco raises sufficiency-of-the-evidence challenges to all three of his counts of conviction. As already discussed, we will affirm a conviction "if, after viewing all the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sims*, 11 F.4th 315, 321 (5th Cir. 2021) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc)); *see also Reed*, 908 F.3d at 123, n.82.

First, Polanco challenges his conviction for conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. To sustain this conviction, the government was required to show "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Peters*, 283 F.3d 300, 307 (5th Cir. 2002). On appeal, Polanco primarily disputes the sufficiency of the evidence with regards to the second element: knowledge of and intent to join the conspiracy.

At trial, the Government argued that Polanco, a Border Patrol agent, was one of the corrupt law enforcement officers who, working with members of the conspiracy, would stage seizures of sham drugs to cover up the thefts from the suppliers. Specifically, the Government alleged that on April 20, 2013, Polanco called in a seizure on a vehicle loaded with 17 kilograms of (sham) cocaine on behalf of Dimas DeLeon, one of the main conspirators.

To support the charge, the Government called several witnesses to testify about their involvement with the staged seizure, the conspiracy, and Polanco. First, Mario Alejandro Solis, a co-conspirator, testified about how he and DeLeon prepared for the April 20, 2013, seizure. In preparation for the seizure, DeLeon told Solis to park the car at an abandoned gas station selected by DeLeon and his "Border Patrol friend," who would be calling in the seizure, to serve as the drop site. Solis testified that DeLeon explained that the Border Patrol contact had chosen the gas station because he was planning to drive up to San Antonio to see a fight and the gas station was on his route.

Solis also testified that, on April 20, 2013 (the day of the planned seizure), he did not park the car out in the front of the gas station as he had been instructed to do. Instead, he parked off to the side, by the back. According to Solis, DeLeon was upset by this deviation from the plan, as it made it difficult for his Border Patrol contact to see the car. Eventually, Solis (who had stayed in the area) saw law enforcement nearby, presumably responding to Polanco's call to Balderas. Solis told the jury that he later heard from DeLeon that the seizure had gone well and that DeLeon was going to pay his Border Patrol friend at the fight in San Antonio.

Other evidence at trial corroborated that Polanco was DeLeon's Border Patrol contact. For instance, although Solis did not know the name of the Border Patrol agent, Polanco does not dispute that he was a Border Patrol agent with plans to travel to San Antonio to see a fight on April 20, 2013. Phone records also showed that Polanco and DeLeon were in close communication on April 19 and 20, 2013, with their phone numbers exchanging three calls and thirty-four texts on the 19th and thirteen calls and fifty-three texts on the 20th. Additionally, the Government introduced testimony from William Shute, an expert in using cell phone records to track locations, that cell phone location records demonstrated that Polanco remained in the area around the gas station for over half an hour the morning

of April 20, 2013, consistent with Solis's testimony that the Border Patrol agent had difficulty locating the car. And the Government introduced grand jury testimony from Monica Garcia, Polanco's girlfriend at the time of the seizure, in which she stated that Polanco got the information about the suspicious vehicle from Dimas DeLeon.[9]

In his testimony at trial, Polanco provided his own explanation of these facts. He testified that he had no agreement with DeLeon to call in the vehicle, and instead had called in the car because its back was "jacked up," that is, the shocks had been adjusted such that it rode higher in the back, which was consistent with cars used to transport contraband. As for his communications with DeLeon, Polanco stated that he had purchased his tickets to the fight from DeLeon (who had a business as a local fight promoter) and was having difficulty getting DeLeon to deliver them. And as to the cell location data showing that he lingered in the area, Polanco claimed that he and Garcia had stopped for gas and food in the area before heading out on the highway.

On appeal, Polanco argues that even if the jury did not accept his own testimony, because the Government's evidence was primarily circumstantial and its witnesses unreliable, the evidence was insufficient to support his conviction. In other words, Polanco would have us step into the shoes of the jury to re-evaluate the weight of the evidence and re-assess the credibility of the witnesses. We decline to do so, and find that the evidence summarized above was sufficient to support his conspiracy conviction.

Next, Polanco challenges his conviction for possession with intent to distribute. To sustain this conviction, the government was required to show

---

[9] Garcia recanted this testimony, as well as statements she had made in earlier interviews with law enforcement, at trial. However, pursuant to Federal Rule of Evidence 801(d)(1)(A), the jury could consider her grand jury testimony as substantive evidence. Whether the jury accepted the version of events contained in Garcia's grand jury testimony or her later trial testimony is a determination of credibility we do not disturb on review.

"(1) the defendant knowingly possessed a controlled substance; (2) the substance was in fact [the controlled substance]; and (3) the defendant possessed the substance with the intent to distribute it." *United States v. Vinagre-Hernadez*, 925 F.3d 761, 764 (5th Cir. 2019) (citation omitted). "Possession may be actual or constructive . . . and may be proved by direct or circumstantial evidence." *United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1095 (5th Cir. 1991) (citation omitted).

On appeal, Polanco primarily argues that the Government did not present evidence showing that he either actually or constructively possessed cocaine. Yet the jury was instructed that they could find liability under the theory of aiding and abetting. Pursuant to 18 U.S.C. § 2, "[w]hoever . . . aids, abets, counsels, commands, induces or procures" the commission of an offense "is punishable as a principal." 18 U.S.C. § 2(a). "Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit." *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992) (citation omitted). Because aiding and abetting is simply "another means of convicting someone of the underlying offense," the district court may give the aiding and abetting instruction so long as evidence is presented to support that theory of liability at trial. *United States v. Sorrells*, 145 F.3d 744, 752 (5th Cir. 1998) (citations omitted).

To find a defendant guilty of the charged offense under a theory of aiding and abetting, the Government must show proof that "the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *United States v. Scott*, 892 F.3d 791, 798 (5th Cir. 2018) (citation omitted). Although a defendant "must share in the intent to commit the offense as well as participate in some manner to assist its commission, . . . [t]he defendant need not, however, commit all elements of the substantive underlying offense as long as he aided and abetted each element." *United States v. Fischel*, 686 F.2d 1082, 1087 (5th Cir. 1982)

(citation omitted). Thus, "[t]o be guilty of aiding and abetting possession of drugs with intent to distribute, each defendant must have aided and abetted both the possession of the drug and the intent to distribute it." *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993).

The same evidence supporting Polanco's conspiracy conviction supports his possession conviction on an aiding and abetting theory of liability. From that evidence, a reasonable jury could conclude that, by calling in the car so that the sham cocaine could be seized and the real drugs successfully sold, Polanco associated and participated in the drug trafficking venture in a way calculated to bring about its success.[10] *See United States v. Salazar*, 958 F.2d 1285, 1292 (5th Cir. 1992) (recognizing that the same evidence used to prove a defendant's conviction for conspiracy to possesses cocaine will typically support an aiding and abetting conviction). For the reasons given above, this challenge must similarly fail.

Finally, Polanco challenges his conviction for making a false statement in violation of 18 U.S.C. § 1001(a)(2). A violation of this section "requires the government to prove that [the defendant]: 1) knowingly and willfully; 2) made a statement; 3) to a federal agency; 4) that was false; and 5) material." *United States v. Taylor*, 582 F.3d 558, 562 (5th Cir. 2009).

At trial, the Government argued that Polanco made a false statement to law enforcement, specifically DEA Agent Santos, by stating that he did not receive a tip about the suspicious vehicle when, in fact, DeLeon had given

---

[10] Polanco does not dispute that an underlying drug offense was committed, although he does dispute the type of narcotic involved. In his briefing, Polanco suggests that the Government failed to prove that the underlying offense involved cocaine, rather than methamphetamine (for which the sham bundles field-tested positive). At trial, however, Polanco admitted via stipulation that later testing at a DEA laboratory showed that the recovered bundles contained trace amounts of cocaine. This is sufficient to prove this element of the underlying offense. Polanco's remaining challenge to his possession conviction mirrors that raised against his conspiracy conviction: namely, that the Government failed to show that he reported the car on DeLeon's behalf rather than of his own accord.

him information about the car. In challenging his conviction on this count, Polanco raises only conclusory arguments, essentially arguing that the evidence was not sufficient because he is not guilty of the underlying substantive offense. Because we have found that the jury had sufficient evidence to find that Polanco did receive information about the car from DeLeon as part of his participation in the conspiracy, we correspondingly find that the jury had sufficient evidence from which to find that Polanco's statements to DEA Agent Santos were false.

For these reasons, we find that Polanco's sufficiency challenges as to each of his convictions must fail.

## 2. Motion for a New Trial

Polanco also attacks his convictions by arguing that the district court erred in denying his motion for a new trial. Federal Rule of Criminal Procedure 33 permits a district court to grant a motion for a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). Ordering a new trial is no small matter, and "[f]or a district court to disturb a jury's verdict and order a new trial, the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Reagan*, 725 F.3d 471, 481 (5th Cir. 2013) (cleaned up). And where a defendant moves for a new trial based on the weight of the evidence, "[a]n appellate court may reverse only if it finds" the district court's denial of the motion to be a "clear abuse of discretion." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997) (citation omitted).

When a district court reviews a motion for a new trial, it may consider the credibility of the witnesses. *See id.* at 1117 ("The trial judge may weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for a new trial."); *see also United States v. Herrera*, 559 F.3d 296, 302 (5th Cir. 2009) (explaining that a district court acts within its discretion in "cautiously reweigh[ing]" the evidence and "[finding] it preponderated heavily against the guilty verdict").

On appeal, Polanco primarily argues that we should do the same and reconsider the jury (and the district court's) credibility determinations to find in his favor. However, he points to no case law suggesting that we have such authority. In fact, in *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005), the court stated that while the district court (taking care not to usurp the role of the jury) may assess the credibility of witnesses in ruling on a motion for a new trial, "[i]n our capacity as an appellate court, we must not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence." *Id.* at 672. Instead, we ask only whether the district court's denial of a motion for a new trial "constituted a clear abuse of its discretion." *Id.*

Here, Polanco's arguments as to his motion for a new trial are essentially the same as those raised in his sufficiency challenge. As discussed above, we find the evidence sufficient to support each of his convictions. We thus find that the district court did not abuse its discretion in denying Polanco's motion for a new trial.

### 3. Rule 404(b) Evidence

Polanco next argues that the district court erred in admitting evidence pursuant to Rule 404(b) that implied that he had once assaulted Garcia. We review a preserved objection to a trial court's evidentiary ruling under an abuse of discretion standard. *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007). This standard is "heightened" when the evidence is admitted pursuant to Rule 404(b) "because evidence in criminal trials must be strictly relevant to the particular offense charged." *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015) (cleaned up).

Under Federal Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence

of mistake, or lack of accident." FED. R. EVID. 404(b). In general, Rule 404(b) "only excludes evidence of other crimes when offered to prove the conduct of a person by resort to an inference as to his character." *United States v. Ebron*, 683 F.3d 105, 132 (5th Cir. 2012) (quoting WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5248).

As a threshold matter, when the evidence sought to be introduced is uncharged, we must first determine if the evidence is "sufficient to support a finding that the crime or act actually occurred." *Smith*, 804 F.3d at 735 (citation omitted); *see also Huddleston v. United States*, 485 U.S. 681, 689 (1988) ("In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.")).

If this threshold requirement is satisfied, we then turn to the question of whether the evidence is admissible under Rule 404(b). This requires a two-prong determination that "(1) [the evidence] is relevant to an issue other than the defendant's character, and [that] (2) it 'possess[es] probative value that is not substantially outweighed by its undue prejudice' under Federal Rule of Evidence 403." *Smith*, 804 F.3d at 735 (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)). As to the first prong, the relevancy of the evidence, we follow the inquiry established under Rule 401 of the Federal Rules of Evidence and ask "whether the evidence has 'any tendency to make a fact more or less probable than it would be without the evidence' and 'the fact is of consequence in determining the action.'" *United States v. Kinchen*, 729 F.3d 466, 472 (5th Cir. 2013) (quoting FED. R. EVID. 401)). As to the second prong, the prejudicial impact of the evidence under Rule 403, we consider "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions," in addition to the "overall prejudicial effect of the extrinsic evidence."

*United States v. Juarez*, 866 F.3d 622, 627 (5th Cir. 2017) (internal quotation marks and citation omitted).

Polanco challenges the admission of evidence that Garcia, during the time she was dating Polanco, filed a police report stating that she had been assaulted by a boyfriend. First, he argues that the evidence was not sufficient to show that he committed the alleged assault. As Polanco notes, the police report introduced as evidence did not name him as the alleged assailant and Garcia never testified that Polanco assaulted her. In fact, at trial, Garcia indicated that she may not have been assaulted at all, but rather that she had fallen while drunk and that some of her bruises were from sex.

Yet other evidence introduced at trial supports that Polanco assaulted Garcia. At trial, Garcia confirmed that she had reported to Edinburg police that she had been assaulted by a boyfriend during the time she was dating Polanco. Garcia also confirmed that an investigator looking into the assault assumed that Polanco was the assailant (although Garcia maintained at trial that she had not been assaulted at all). Additionally, at trial, Garcia avoided explicitly denying that Polanco assaulted her, even when given multiple opportunities to do so. Rather than confirm that Polanco did not assault her, Garcia instead emphasized that she never filed an official report naming him as the assailant. Given this evidence, the jury could reasonably conclude that Garcia's later denials that an assault occurred were not credible and that Polanco was the assailant.

We therefore turn to the first prong of the *Beechum* test, whether the proffered evidence was relevant to an issue other than Polanco's character. While Polanco contends that evidence as to the assault was entered solely to malign his character, the trial record shows that it was offered for the permissible purpose of explaining why Garcia's testimony may have changed between the time she testified before the grand jury in 2017 (when she stated that Polanco received information about the suspicious vehicle from DeLeon) and the time of trial (when she claimed that *she* spotted the vehicle

and urged Polanco to call it in). Specifically, evidence of the assault suggested that Garcia may have been afraid of testifying publicly against Polanco, who had previously been violent with her.

Turning next to the second prong of the *Beechum* test, we find that the probative value of this evidence is not substantially outweighed by undue prejudice such that it was an abuse of discretion for the district court to allow for its admission into evidence. First, the Government demonstrated sufficient need for the evidence: Garcia's testimony before the grand jury that Polanco had received the location of the vehicle from DeLeon was highly relevant to each of the three charges against him, and the Government was attempting to explain why her testimony may have shifted by the time of trial. Second, there is little similarity between the charged offenses, all of which stemmed from participation in a drug conspiracy, and domestic assault. *See Kinchen*, 729 F.3d at 473 (noting that the "more closely an extrinsic offense resembles the charged offense, the greater the prejudice to the defendant"). As for the third factor, the time between offenses, we note that although the alleged assault occurred within the same year as the charged offense, it also occurred years before Garcia's testimony before both the grand jury and at trial. Admittedly, this temporal remoteness weakens the Government's argument that Garcia may have changed her testimony out of fear of publicly testifying against Polanco. However, the existence of the fourth factor—the district court's limiting instruction to the jury that some evidence goes to the truthfulness of the witness and not to the truth of the underlying allegations—helps assuage any concern as to its admission.

"Even if all four factors weigh in the Government's favor," we "must still evaluate the district court's decision under a commonsense assessment of all the circumstances surrounding the extrinsic offense." *United States v. Jones*, 930 F.3d 366, 374 (5th Cir. 2019) (internal quotation marks and citation omitted). Here, although the alleged assault was likely prejudicial, *United States v. Ricard*, 922 F.3d 639, 654 (5th Cir. 2019) (describing extrinsic

evidence of "violent acts" as one of the "hallmarks of highly prejudicial evidence") (citation omitted), Polanco was on trial for serious drug offenses. Under these circumstances, we see no substantial undue prejudice and do not find an abuse of discretion.[11]

### 4. Confrontation Clause

Finally, Polanco contends that the district court's rulings violated his Confrontation Clause rights. Specifically, Polanco argues that because the backpacker did not testify at trial, the Government should not have been allowed to introduce testimony from Jose Mares, a Border Patrol agent. Mares, who conducted the interview with the backpacker who Polanco processed and from whom Polanco allegedly received information about the suspicious vehicle, testified as to his own conversations with the backpacker.

A preserved Confrontation Clause objection is reviewed "*de novo*, subject to harmless error analysis." *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008).

Under the Sixth Amendment's Confrontation Clause, an "accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. When determining whether admitted evidence violated the Confrontation Clause, this court asks three questions: "*First*, did

---

[11] Finally, "erroneous admissions under Rule 404(b) are subject to a harmless error inquiry." *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008). Under this inquiry, "[w]hen the other evidence of guilt is overwhelming, and the error would not have substantially influenced the jury's verdict, the error is harmless." *United States v. Flores*, 640 F.3d 638, 643 (5th Cir. 2011) (citation omitted). Although the determination as to whether to accept Garcia's testimony before the grand jury or at trial as to why Polanco reported the car likely impacted the jury's credibility determinations, particularly as to Polanco's own testimony, it was well-established that Garcia was a reluctant witness and that she had changed her story to protect Polanco even without the introduction of the alleged assault. Moreover, the district court's limiting instruction provided immediately before the introduction of the alleged assault, also blunted the impact of any prejudice to Polanco. Given these factors, as well as the other evidence (discussed above) supporting Polanco's conviction, we find that any error was harmless.

the evidence introduce a testimonial statement by a nontestifying witness? *Second*, was any such statement offered to prove the truth of the matter asserted? *Third*, was the nontestifying witness available to testify, *or* was the defendant deprived of an opportunity to cross-examine him?" *United States v. Hamann*, 33 F.4th 759, 767 (5th Cir. 2022). If the answer to each question is "yes," then the Confrontation Clause was violated and we must review for harmless error. *Id.*

As to the first question, Polanco is unable to point to any statement by the witness introduced through Mares's objected-to testimony. To begin, Mares testified about the *lack* of any statement from the backpacker about cocaine or its transportation in specific types of cars or on specific highways.[12] Accordingly, because Mares did not testify about any out-of-court statement, there is no Confrontation Clause violation.

As to the second question, even if we considered the backpacker's (non) statements to Mares to be testimonial statements for purposes of the Confrontation Clause, Polanco fails to show that the (non) statements by the backpacker were offered for the truth of the matter asserted. Instead, the significance of Mares's testimony was whether he could confirm Polanco's story about where he got the information about the suspicious vehicle. It was not offered for the truth of the matter asserted. *See United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989) ("If the significance of a statement lies solely in the fact that it was made, rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not

---

[12] The Government's definition of a "statement" is taken from the text of Federal Rule of Evidence 801, which defines a statement in the context as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FED. R. EVID. 801(a). Although this definition arises in the context of the hearsay rules, we find it instructive as to our Confrontation Clause analysis. *See White v. Illinois*, 502 U.S. 346, 353 (1992) (recognizing that "hearsay rules and the Confrontation Clause are generally designed to protect similar values and stem from the same roots") (cleaned up).

offered to prove the truth of the matter asserted.") (internal quotation marks and citation omitted). Polanco suggests that because evidence that the backpacker did not tell Mares any details about the drug trafficking tends to prove or disprove his own narrative of events, it is necessarily offered for the truth of the matter asserted. In taking this position, Polanco improperly conflates the matter asserted in the criminal trial (his guilt or lack thereof) and the matter asserted in the statement (whether drug trafficking was occurring, whether the drugs were cocaine or marijuana, whether the cars used in the trafficking were big or small).

In sum, Polanco cannot show that Mares's testimony violated his rights under the Sixth Amendment. The district court therefore did not err in admitting the testimony.

III.

We AFFIRM the district court.