# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 95-40093

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

versus

**MANUEL VALDEZ-ANGUIANO**,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

June 12, 1996

Before POLITZ, Chief Judge, WIENER and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:[*]

Manuel Valdez-Anguiano appeals his convictions for conspiracy to possess with intent to distribute cocaine;[1] conspiracy to import cocaine;[2] possession with intent to distribute cocaine;[3] importation of cocaine;[4] and using and carrying a firearm during and in relation to a drug trafficking

---

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

[1] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846.

[2] 18 U.S.C. § 2, 21 U.S.C. §§ 952, 960(a)(1), 960(b)(1)(B), 963.

[3] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II).

[4] 18 U.S.C. § 2, 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii).

offense.[5]  For the reasons assigned we affirm.

## BACKGROUND

While on surveillance near Stinton, Texas in August of 1986, law enforcement authorities observed a Piper Aztec aircraft land at the San Patricio County Airport and several men unload its cargo of heavy crates into the bed of a pickup truck.  The authorities unsuccessfully sought to stop the truck as it left the airport.[6]  The men who unloaded the cargo, Valdez-Anguiano, Alberto Cruz Alaniz, Gerardo Guerra and Ricardo Leveck, were arrested.  A search of a vehicle on the scene revealed a two-way radio, an electronic transponder detector, and a loaded .45 caliber automatic pistol.  Each of the suspects denied ownership of the vehicle, the property confiscated, and the aircraft.

In March 1987, a trained canine alerted on Valdez-Anguiano's luggage at DFW International Airport.  After securing Valdez-Anguiano's consent, the luggage was opened and the authorities discovered $289,000 in $20 bills.  Valdez-Anguiano explained to the authorities that while in California he was contacted by three strangers who asked him to transport the money to an acquaintance in McAllen, Texas.

In the summer of 1987 a paid informant, Jose Fernandez, met Valdez-Anguiano in McAllen, Texas to discuss the importation of cocaine from Mexico.  Fernandez agreed to participate and Valdez-Anguiano gave him approximately $32,000 to purchase a Piper Aztec aircraft in which to smuggle the cocaine.[7]  Fernandez discussed the planned scheme on numerous occasions with Valdez-Anguiano and several of his associates, including Clemente Caceres and Oscar Garcia-Rodriguez.  During these discussions Valdez-Anguiano disclosed that the cocaine to be shipped into the United States would come from his supplier in Colombia via his ranch near Ciudad Victoria, Mexico.

On October 2, 1987, Fernandez flew a Beechcraft Queen Air aircraft from Valdez-Anguiano's

---

[5]18 U.S.C. §§ 2, 924(c)(1), 21 U.S.C. § 952(a).

[6]Two unidentified vehicles assisted in the escape by running interference.

[7]He also gave Fernandez a Ford Bronco to compensate for his complicity in the proposed scheme.

ranch with a load of cocaine for delivery in the United States.[8]  Fernandez was accompanied by a passenger, Oscar Garcia-Rodriguez, who was armed with a Colt AR-15 assault rifle to protect the shipment.

Meanwhile a pickup truck registered to Valdez-Anguiano and a Chevrolet Suburban entered the Nordheim airstrip near Yorktown, Texas.  After a meeting in the middle of the airstrip, the truck drove to the north end and the Suburban drove to the south end.  At approximately 2:30 a.m. some of the men present began to light the airstrip with flares while Valdez-Anguiano directed the aircraft to its landing by way of radio.  As the aircraft landed both vehicles approached and the cargo was unloaded quickly into the Suburban and the plane departed.

The truck then drove to the north end of the airstrip and the Suburban proceeded to the south end.  At this point the authorities made their presence known and identified themselves to the driver and passenger of the Suburban.  Two shotgun blasts were fired from the Suburban; the authorities returned fire.  Caceres, the driver, was wounded in the leg and the passenger, Rodrigo Olivares-Prado, was killed.[9]  The Suburban contained more than 1,000 pounds of cocaine with a street value of approximately $146 million.

At the north end of the airstrip the occupants fled the truck and proceeded into the brush on foot.  The authorities arrested Ramiro Olivares-Prado and Garcia-Rodriguez several miles north of the airstrip that same day.  Valdez-Anguiano alluded detection.  On October 4, 1987 a Karnes County Deputy Sheriff unsuccessfully attempted to arrest Valdez-Anguiano near a farm approximately 25 miles north of the Nordheim airstrip.  Valdez-Anguiano remained a fugitive for approximately seven years until he was arrested at the Hidalgo port of entry in Hidalgo, Texas.  He was tried to a jury, convicted on all counts, and sentenced to a total of fifty years in prison.  He timely appeals.

## ANALYSIS

### A.    Double Jeopardy

---

[8]The Piper Aztec bought by Valdez-Anguiano had been disabled previously by Fernandez.

[9]Rodrigo Olivares-Prado's dead body was found clutching a .12 gauge shotgun.

Valdez-Anguiano argues on appeal that the forfeiture of the $289,000 at DFW airport constituted punishment under the double jeopardy clause and that the subsequent prosecution violated the fifth amendment. The government contends that Valdez-Anguiano waived this challenge because he failed to raise it below. Valdez-Anguiano counters that even though he failed to raise this challenge below we should review for plain error. Were we to review for plain error, Valdez-Anguiano's challenge would fail; the record does not reflect that Valdez-Anguiano was a party to the forfeiture proceedings.[10]

**B.      Tardy Disclosure of Brady Material**

Valdez-Anguiano complains that the government's failure to disclose prior to trial that its paid informant, Jose Fernandez, had been convicted in Mexico for electronics smuggling violated **Brady v. Maryland**[11] because this tardy disclosure rendered his trial unfair when evaluated under the totality of the circumstances.[12] Absent proof of prejudice and that the defendant was denied a fair trial, tardy disclosure of **Brady** impeachment material is not reversible error.[13]

Valdez-Anguiano has failed to identify any prejudice. Defense counsel admitted that he knew that Fernandez had been arrested on this charge and was not surprised to learn of the conviction. Moreover, Fernandez was cross-examined regarding the conviction, and was made available to be re-called as a witness, an offer Valdez-Anguiano declined. The defendant's speculation that timely receipt of this information would have permitted further investigation into that witness's background and would have enhanced impeachment is not sufficient to show the requisite prejudice.

---

[10]**United States v. Arreola-Ramos**, 60 F.3d 188 (5th Cir. 1995).

[11]373 U.S. 83 (1963).

[12]See **Kyles v. Whitley**, 115 S.Ct. 1555 (1995). In **Kyles**, the Court held that to determine the existence of a **Brady** violation we must inquire whether the government's evidentiary suppression undermines confidence in the outcome of the trial. **Id.** (citing **United States v. Bagley**, 473 U.S. 667 (1985).

[13]See **United States v. Neal**, 27 F.3d 1035 (5th Cir.), cert. denied, 115 S.Ct. 530 (1994); **United States v. McKinney**, 758 F.2d 1036, 1050 (5th Cir. 1985) ("The courts have uniformly held that, in such circumstances, the inquiry is whether the defendant was prejudiced by the tardy disclosure.").

## C.    Material Variance

Valdez-Anguiano maintains that while the indictment alleged a single conspiracy the evidence at trial established two separate conspiracies, i.e., the Stinton conspiracy and the Nordheim conspiracy.[14]  He bases this argument in large part on the fact that none of the charged co-conspirators overlap between the two incidents.  This variance, he claims, requires reversal of his conviction.  Reversal is warranted only if the defendant proves a variance and that the variance prejudiced Valdez's substantial rights.[15]  In a conspiracy prosecution we examine three factors to determine if the government proved the single conspiracy alleged in the indictment:  (1) whether there was a common goal, (2) the nature of the scheme, and (3) whether the participants in the various dealings overlapped.[16]  If the defendant failed to establish prejudice to his substantial rights we need not determine whether there was a variance.  Assuming arguendo a variance, Valdez-Anguiano's substantial rights were not affected because the government proved beyond a reasonable doubt that he is guilty of one conspiracy.[17]

## D.    Sufficiency of the Evidence

Valdez-Anguiano contends that the evidence is insufficient as a matter of law to support his convictions.  He moved for a judgment of acquittal on the conspiracy offenses and the firearms offense, but not on the possession with intent to distribute and importation counts.  Accordingly, we review the former to determine whether a reasonable trier-of-fact could have found the essential

---

[14]Counts one and two of the indictment allege, respectively, that between August 7, 1986 (the time of the Stinton incident) and October 2, 1987 (the time of the Nordheim incident) Valdez-Anguiano, Clemente Caceres, Alberto Cruz Alaniz, Oscar Garcia-Rodriguez, Ramiro Olivares-Prado, Gerardo Guerra, and Ricardo Leveck conspired to possess with intent to distribute cocaine and to import cocaine.  Alaniz, Guerra, and Leveck took part in the activities at Stinton; Caceres, Olivares-Prado, and Oscar Garcia-Rodriguez took part in the activities surrounding Nordheim.

[15]**United States v. Jackson**, 978 F.2d 903 (5th Cir.), cert. denied, 508 U.S. 945 (1993).

[16]**United States v. Ross**, 58 F.3d 154 (5th Cir.), cert. denied, 116 S.Ct. 404 (1995).

[17]**United States v. Faulkner,** 17 F.3d 745 (5th Cir.), cert. denied, 115 S.Ct. 193 (1994).

elements beyond a reasonable doubt[18] and the latter to discern whether affirmance of the conviction would result in a manifest miscarriage of justice.[19]

The first two counts of the indictment allege, respectively, a conspiracy to possess cocaine with intent to distribute and a conspiracy to import cocaine. To establish a conspiracy, the government must prove beyond a reasonable doubt that (1) an agreement existed between two or more persons to accomplish unlawful ends, (2) the defendant had knowledge of the agreement, and (3) he voluntarily participated. Count three alleges possession with intent to distribute, which requires proof beyond a reasonable doubt that the defendant knowingly possessed the contraband with intent to distribute. Count four charges importation. To establish importation the government must prove beyond a reasonable doubt that the defendant participated in bringing a quantity of a controlled substance into the United States knowing that the substance was controlled and that it would enter the United States. Alternatively, the indictment charges aiding and abetting the commission of the above substantive offenses. To establish aiding and abetting the government must prove that the defendant associated with a criminal venture, participated therein, and actively sought its successful conclusion.[20]

The evidence overwhelmingly supports the drug convictions. The evidence established that Valdez-Anguiano actually possessed an immense quantity of cocaine as it was off loaded from the aircraft at the Nordheim airstrip.[21] The evidence also established that Valdez-Anguiano supervised and managed an operation in which several persons were involved; he engaged Fernandez to pilot the shipment of cocaine from his ranch in Mexico into the United States, he purchased a Piper Aztec to be used in such covert operation even though it was not actually used, he and several of his co-

---

[18]**United States v. Crooks,** 1996 WL 218850 (5th Cir. 1996).

[19]**United States v. Hall**, 845 F.2d 1281 (5th Cir.), <u>cert.</u> <u>denied</u>, 488 U.S. 860 (1988).

[20]**Crooks.**

[21]<u>See</u> **United States v. Resio-Trejo**, 45 F.3d 907 (5th Cir. 1995) (intent to distribute may be inferred from the quantity and cost of the drugs). The evidence also abundantly supports a finding that he constructively possessed the cocaine at various points in the operation.

conspirators met with and discussed the scheme with Fernandez, and he directed Fernandez via air-to-ground radio to the clandestine airstrip near Yorktown, Texas.

Valdez-Anguiano also attacks his 18 U.S.C. § 924(c) conviction. To establish a violation of section 924(c) the government must prove beyond a reasonable doubt that the defendant used or carried a firearm during and in relation to a drug trafficking offense.[22] To prove the alternative charge, that he aided and abetted the same, the government must establish beyond a reasonable doubt that during and in relation to a drug crime he aided and abetted the use or carrying of a firearm by another.[23]

Assuming that Valdez-Anguiano neither carried not used[24] a firearm in relation to the drug offenses, the government maintains that his conviction nevertheless is proper because his co-conspirator fired on the authorities at the Nordheim airstrip while trying to escape. We agree. When a **Pinkerton** instruction is given to the jury, a defendant may be convicted under section 924(c) based on a co-conspirator's use of a weapon during a drug trafficking crime.[25] One of Valdez-Anguiano's co-conspirators used a shotgun during and in furtherance of the drug trafficking conspiracy; Valdez-Anguiano was properly convicted of this count.[26]

## E.      Evidentiary Ruling

Valdez-Anguiano challenges the district court's ruling permitting the jury to hear evidence of the $289,000 seized at DFW. We review for abuse of discretion.[27] First, he alleges that this evidence should have been excluded under Fed.R.Evid. 404(b). To decide the admissibility of

---

[22]**Bailey v. United States**, 116 S.Ct. 501 (1995).

[23]See **United States v. Davis**, 61 F.3d 291 (5th Cir. 1995), cert. denied, 116 S.Ct. 961 (1996).

[24]"Use of a firearm" means "active employment" and that "active employment" obviously includes firing a weapon. **Bailey.**

[25]See **United States v. Dean**, 59 F.3d 1479 (5th Cir. 1995), cert. denied, 116 S.Ct. 748 (1996).

[26]The evidence also supports a finding that Valdez-Anguiano is guilty of aiding and abetting this substantive offense.

[27]**United States v. Royal**, 972 F.2d 643 (5th Cir. 1992), cert. denied, 507 U.S. 911 (1993).

"similar acts" or "other acts" evidence we must determine whether the evidence is intrinsic or extrinsic. Such evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined, both acts are part of a single criminal episode, or the other acts were necessary preliminaries to the crime charged.[28] Valdez-Anguiano's possession of $289,000 in $20 bills is intrinsic to the conspiracy; this large amount of cash was discovered a few months prior to Valdez-Anguiano giving Fernandez approximately $32,000 in cash to purchase a Piper Aztec airplane to be used in the importation. Additionally, Valdez-Anguiano contends that the district court erred by ruling that the probative value of this evidence was not substantially outweighed by its prejudicial effect.[29] We perceive no abuse of discretion in either ruling.

The convictions are **AFFIRMED.**

---

[28]**United States v. Williams,** 900 F.2d 823 (5th Cir. 1990).

[29]Fed.R.Evid. 403.