# United States Court of Appeals for the Fifth Circuit

---

No. 24-10126

---

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2025

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Sean Shaughnessy,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-189-1

---

Before Stewart, Dennis, and Haynes, *Circuit Judges*.

Per Curiam:

Sean Shaughnessy appeals his conviction and sentence following a jury's verdict finding him guilty of two drug-conspiracy counts, one distribution count, and one possession of child pornography count, all arising from his use of online dark web marketplaces to traffic narcotics. He challenges the sufficiency of the evidence supporting his conspiracy convictions, the admission of certain trial evidence, and the application of a sentencing enhancement. For the reasons that follow, we AFFIRM.

No. 24-10126

## I

Shaughnessy's convictions stem from a multi-year federal investigation into a digital drug-trafficking enterprise he ran on the "dark web." The dark web is a concealed segment of the internet that requires special software to access and masks users' identities and locations through layers of encryption. Within that hidden network, Shaughnessy maintained pseudonymous vendor accounts on multiple "dark web marketplaces" (DWMs). There, he advertised, sold, and shipped controlled substances and analogues to buyers nationwide and accepted payment in the cryptocurrency Bitcoin[1] to preserve anonymity, which he converted to cash through unregulated avenues that avoided identity verification.

Between 2016 and 2019, federal and state investigators conducted searches of Shaughnessy's residences and related surveillance that yielded a cohesive body of evidence tying him to this scheme, including: seizures of narcotics and shipping supplies; handwritten and digital ledgers detailing orders, pseudonyms, addresses, and payments; intercepted international parcels to his post office box; undercover Bitcoin-to-cash exchanges; and forensic examinations of his computers linking the conduct to his accounts and revealing an encrypted folder containing child pornography.

## A

Shaughnessy's involvement with the dark web drew law-enforcement attention in July 2016, when Irving, Texas police officers arrested him at a Motel 6 on an unrelated warrant. During the arrest, officers observed white powder beneath Shaughnessy's nostrils and saw him drop a bag of white powder. A field test presumptively indicated the bag contained

---

[1] We have previously detailed the function and use of the cryptocurrency Bitcoin. *See United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

approximately 15.1 grams of cocaine. Officers then obtained a warrant to search the room and Shaughnessy's vehicle. The search uncovered 462 additional grams of suspected cocaine, digital scales, unused plastic baggies, numerous postal shipping labels, tracking slips, and mailing envelopes addressed to various recipients. Officers also recovered handwritten ledgers that investigators would later determine detailed Shaughnessy's use of multiple DWMs to distribute narcotics, listing usernames, customer addresses, quantities sold, payment records, and shopping lists for drugs including fentanyl and pentedrone.

A Texas grand jury indicted Shaughnessy on one court of possession with intent to distribute cocaine.[2] However, laboratory analysis by the Southwestern Institute of Forensic Sciences (SWIFS) failed to identify most of the seized powders, save for 2.8 grams of a mixture it determined contained cocaine, pentedrone, and other substances. Shaughnessy pleaded guilty to attempted possession of a cocaine and, on August 11, 2017, the state court sentenced him to 90-days' imprisonment, but he was released the same day after crediting time served.

That same month, undercover federal agents encountered Shaughnessy when he sought to liquidate Bitcoin later traced to his narcotics sales. After failing to cash out his Bitcoin through a regulated cryptocurrency exchange that required documentation he could not provide, Shaughnessy turned to "Gold," another dark web vendor who anonymously mailed U.S. currency in exchange for Bitcoin and charged substantially higher fees than traditional exchanges. Unbeknownst to Shaughnessy, Gold was cooperating with federal authorities, and Homeland Security Investigations Special Agent Jason Samuels had assumed control of the account. Between August and

---

[2] *See Texas v. Shaughnessy*, No. F-16-34034 (Tex. Dist. Ct. Aug. 30, 2016).

No. 24-10126

October 2017, Agent Samuels recorded roughly $150,000 in Bitcoin-to-cash transactions with Shaughnessy. Agents also intercepted one package and met Shaughnessy in person, at which point he declined to explain the source of the funds or identify his occupation.

The investigation continued over the following months. In November 2017, SWIFS reexamined the substances seized during the July 2016 search of Shaughnessy's motel room. Their analysis concluded that the 15.1 and 462 grams of suspected cocaine were the controlled substance analogue *N*-ethylhexedrone.[3] In March and April 2018, U.S. Customs and Border Protection intercepted two international packages addressed to a post office box in Addison, Texas belonging to Shaughnessy. Each package originated in China and contained large quantities of *N*-ethylhexedrone—941 grams in one and 49 grams in the other. Postal records showed that the same box had received at least eleven international shipments from China and Hong Kong.

A month later, in May 2018, federal agents and local officers executed a search warrant at Shaughnessy's residence in Irving, Texas. Inside a bedroom safe, they found 246.8 grams of *N*-ethylhexedrone and 84.7 grams of FUB-144, another controlled substance analogue.[4] Agents also recovered additional drug paraphernalia and a laptop. A forensic review of the laptop uncovered a text file containing another detailed ledger of narcotics transactions, including product names, dates, quantities, shipping addresses, and references to DWM platforms. The same review linked Shaughnessy to

---

[3] *N*-ethylhexedrone is an analogue of the controlled substance pentedrone, both synthetic cathinones. Synthetic cathinones are a class of stimulants commonly marketed as "bath salts."

[4] FUB-144 is a synthetic cannabinoid and classified as a Schedule I controlled substance analogue. *See* Temporary Placement of FUB-144 into Schedule I, 84 C.F.R. § 15505 (2019); Placement of FUB-144 into Schedule I, 87 C.F.R. § 20318 (2022).

the email address "Fent4U@safemail.net," a moniker also found in DWM user profiles. Agents arrested Shaughnessy based on an outstanding warrant in Texas, but he was released on bond.

Agents traced several shipments listed in Shaughnessy's ledgers to his customers in Texas. Two individuals—Jennifer Greer and Britt Osbourn— later testified that they had purchased fentanyl and fentanyl analogues from Shaughnessy through the DWMs "Dream" and "Trade Route." A third recipient, Darrell Hawk, died in November 2017 from an overdose involving methoxyacetyl fentanyl (MAF)[5] shortly after receiving a package mailed by Shaughnessy. In each case, the transaction details were corroborated by entries in Shaughnessy's ledgers.

Finally, in May 2019, federal agents executed a second search warrant at a Keller, Texas residence where Shaughnessy had been staying while on bond for his pending state offense. They recovered another laptop containing a similarly structured ledger of narcotics transactions and continued access to the "Fent4U" email account. During the forensic review of that device, agents also discovered an encrypted folder titled "2018 Amateur Teens Part 1." Agents decrypted the folder using a password listed just above saved links to DWM platforms found in a nearby text file. Among the folder's contents were fourteen still images and eight videos depicting minors engaged in sexually explicit conduct.

B

One month before agents executed the May 2019 search in Keller, Texas, a grand jury returned an eleven-count indictment charging

---

[5] MAF is a synthetic opioid and classified as a Schedule I controlled substance. *See* Temporary Placement of Methoxyacetyl Fentanyl Into Schedule I, 21 C.F.R. § 42754 (2017); Placement of Methoxyacetyl Fentanyl in Schedule I, 84 C.F.R. § 57323 (2019).

No. 24-10126

Shaughnessy with two drug-trafficking conspiracies, a distribution count, and money laundering. Three superseding indictments followed. The third, in April 2023, reorganized the charges into two conspiracies—one involving the controlled substances fentanyl, carfentanil, pentedrone, and MAF after scheduling (Count One), and the other involving the controlled substance analogues FUB-144, *N*-ethylhexedrone, and MAF before scheduling (Count Two)—along with two distribution counts involving fentanyl and MAF (Counts Three and Four, respectively), eight money-laundering counts (Counts Five through Twelve), and one count of possession of three images of child pornography (Count Thirteen). The district court dismissed the money-laundering counts on the Government's motion.

At trial, the Government presented to the jury the physical, digital, and witness evidence underlying the charges including ledgers, seized narcotics, mailing materials, intercepted parcels, forensic laptop extractions, and customer testimony. The Government also elicited, without objection, testimony from Agent Samuels about Shaughnessy's use of the dark web vendor Gold to convert Bitcoin to cash. Finally, the district court permitted the Government, over Shaughnessy's objection, to admit and publish to the jury two uncharged videos depicting child pornography recovered from Shaughnessy's laptop under Federal Rule of Evidence 404(b).

At the close of the Government's case, Shaughnessy moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied. Shaughnessy then rested without introducing any evidence in his defense. The jury found him guilty on Counts One, Two, Four, and Thirteen, acquitted him on Count Three, and specifically found that he conspired to possess with intent to distribute each controlled substance and analogue listed in the indictment.

No. 24-10126

A presentence investigation report calculated an advisory imprisonment range of 235 to 293 months. Relevant here, the Guidelines calculation included a five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D), which applies when an offense involves 600 or more images of child pornography. The enhancement was derived from the fourteen still images and eight videos recovered from Shaughnessy's laptop, with each video qualifying as seventy-five images under the Guidelines, totaling 614 images of child pornography. § 2G2.2 cmt. n.6(B)(ii).

Shaughnessy objected to the enhancement, relying on two emails between the Government and the National Center for Missing and Exploited Children (NCMEC) identifying only five images in Shaughnessy's possession as a "known series" of child pornography. At Shaughnessy's sentencing hearing, the Government presented testimony from the forensic analyst who had reviewed the files, Robert Pircher, to support applying the enhancement. The court examined Mr. Pircher's methodology in detail and ultimately credited his testimony. The district court overruled the objection, applied the enhancement, and adopted the PSR's guideline calculation in full. The court sentenced Shaughnessy to 240 months on Counts One, Two, and Four, to run concurrently, and 120 months on Count Thirteen, with 67 months to run concurrently and 53 months consecutively. The resulting aggregate term was 293 months' imprisonment, the top of the applicable guidelines range. This appeal followed.

## II

Shaughnessy presses four challenges: (A) the Government's evidence was insufficient to support his conspiracy convictions; (B) testimony and records of his Bitcoin-to-cash transactions with Gold were wrongly admitted as extrinsic evidence of uncharged money laundering conduct; (C) the district court abused its discretion by admitting two uncharged videos of child

pornography under Rule 404(b); and (D) the evidence did not support the application of the five-level sentencing enhancement under U.S.S.G. § 2G2.2(b)(7)(D). We address and reject each of the issues appealed.

A

We begin with Shaughnessy's challenge to the sufficiency of the evidence supporting his convictions for conspiracy to possess with intent to distribute controlled substances (Count One) and controlled substance analogues (Count Two). Because Shaughnessy moved for a judgment of acquittal at the close of the Government's case and "rest[ed] without introducing any evidence," our review is de novo. *United States v. Resio-Trejo*, 45 F.3d 907, 910 n.6 (5th Cir. 1995) (citing *Clark v. United States*, 293 F.2d 445, 448 (5th Cir. 1961)). We ask "whether a reasonable jury could have properly concluded, weighing the evidence in a light most deferential to the verdict rendered by the jury, that all of the elements of the crime charged had been proven beyond a reasonable doubt." *United States v. Hope*, 487 F.3d 224, 227 (5th Cir. 2007).

To sustain a conviction for conspiracy to distribute controlled substances or controlled substance analogues, the Government must prove three elements beyond a reasonable doubt, but Shaughnessy challenges only the sufficiency of the evidence supporting the first: "the existence of an agreement between two or more persons to violate narcotics laws[.]"[6] *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (quoting *United States v.*

---

[6] The remaining elements are "knowledge of the conspiracy and intent to join it" and "voluntary participation in the conspiracy." *Chapman*, 851 F.3d at 376 (citation omitted). Shaughnessy does not dispute, for purposes of this appeal, the identity of the charged substances in Counts One and Two or that the record would permit a finding that he possessed them with intent to distribute; his argument is limited to the absence of evidence supporting any conspiratorial agreement.

No. 24-10126

*White*, 219 F.3d 442, 445 (5th Cir. 2000)). A conspiratorial agreement "need not be express or explicit; tacit agreement is sufficient." *Id.* (citing *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014)). It may be established "with only circumstantial evidence" demonstrating a "tacit, mutual agreement with common purpose, design, and understanding" or "inferred from concert of action." *Id.* (quoting *Shoemaker*, 746 F.3d at 623); *United States v. Farias*, 469 F.3d 393, 398 (5th Cir. 2006). And a conspiracy may rest on "unknown" coconspirators provided the evidence proves both their existence and their complicity. *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989).

Viewing the evidence in the light most deferential to the verdict, a reasonable jury could have concluded that Shaughnessy conspired to possess with intent to distribute controlled substances and controlled-substance analogues with two sets of actors: (1) the DWM administrators and moderators who facilitated his ongoing drug sales by providing essential infrastructure and support; and (2) the upstream suppliers who repeatedly furnished him with bulk quantities of controlled substances and analogues for redistribution.

*First*, the Government presented extensive evidence detailing how DWMs are established and designed to facilitate the sale of illicit drugs and other contraband. These platforms are accessible only through specialized, anonymizing software, and "95 percent to 99 percent" of the items listed for sale are illegal. DWMs are created and maintained by individual administrators who employ moderators to provide essential support. These administrators and moderators set and enforce vendor policies and provide tools tailored for high-volume, anonymous drug transactions, including escrow accounts, dispute-resolution mechanisms, vendor-rating systems, and encrypted buyer-seller messaging.

Shaughnessy relied on these platforms and tools to accomplish his drug-trafficking enterprise. He registered vendor accounts on at least sixteen DWMs where he, under various pseudonyms, marketed and sold a rotating inventory of controlled substances and analogues. On the DWM "Dream Market," for example, Shaughnessy operated under the alias "Fent4U" and promoted himself as a high-volume, reliable seller of narcotics. His vendor profile listed Dream Market's endorsement of him as a "best choice" for quality and price, and chronicled multiple exchanges with site support. He reported account problems, noting he had "emailed them many times with no luck." He recounted a similar issue with his vendor profile on a different DWM, "Trade Route," where he had been locked out of his account with "over 20k in escrow." Shaughnessy speculated that Dream Market had closed his storefront because he had "not sent any product" but "hop[ed] support opens [his] store back up." He later announced he was "back up and running" and that his "bags are heavy." Finally, Shaughnessy's drug ledgers, along with trial testimony from his customers, confirmed that he sold the controlled substances and analogues listed in his indictment through these DWMs.

From this evidence, a reasonable jury could infer a coordinated, reciprocal relationship between Shaughnessy and DWM administrators and moderators sufficient to support his conspiracy convictions. The platform administrators and moderators created and maintained a system explicitly tailored to anonymous drug distribution and Shaughnessy repeatedly used and appealed to that system to facilitate hundreds of illegal transactions. And where a service provider knowingly furnishes—and the defendant relies upon—the tools, protections, and coordinated assistance necessary to sustain a distribution venture, a jury may infer a conspiratorial meeting of the minds. *Cf. United States v. Hinojosa*, No. 22-10584, 2024 WL 841088, at *9 (5th Cir. Feb. 28, 2024) (finding sufficient evidence of narcotics conspiracy

where club owners "actively facilitated the sales" of narcotics with drug dealers who boosted club attendance and revenue).

Our conclusion is consistent with similar decisions of our sister circuits. For example, the Eleventh Circuit, on a plea record, held it was not plain error to find a vendor conspired "with unknown dark web marketplace administrators to illegally distribute controlled substances" where the platforms were "deliberately established by unknown administrators to promote and assist his illegal narcotics sales, protect his identity, and conceal the source of the payments he received." *United States v. Decker*, 832 F. App'x 639, 647–48 (11th Cir. 2020). And the Fourth Circuit upheld a wire-fraud conspiracy conviction based partly on the relationship between a dark web administrator and his users, emphasizing that the administrator knowingly built and promoted a platform designed to facilitate illegal activity and maintained an indirect but coordinated relationship with its users to advance their criminal schemes. *United States v. Bondars*, 801 F. App'x 872, 882 (4th Cir. 2020). Both decisions emphasize near-identical evidence to that presented by the Government at trial in support of Shaughnessy's conspiracy: the mutual interests, the sophistication of the platform, the anonymity required, and the services offered to vendors and other users.

This also distinguishes Shaughnessy's conspiracy from those relying on a mere "buyer-seller" relationship. A conspiracy charge cannot be sustained on evidence of a one-off transaction between a supplier and an acquirer. *See United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc). But that precept does not shield repeat collaborators who knowingly advance a shared distribution objective. *Id.* Here, the evidence showed not isolated or incidental contact, but years-long integration into a system of dark web markets whose operators actively enabled Shaughnessy's trafficking. That permitted the jury to infer a tacit agreement. *See Chapman*, 851 F.3d at 376; *Delgado*, 672 F.3d at 333.

*Second*, the jury also heard ample evidence from which it could conclude that Shaughnessy conspired with upstream suppliers who furnished him with bulk quantities of controlled substance analogues for redistribution. Investigators intercepted two parcels addressed to Shaughnessy's post office box originating from China containing large quantities of *N*-ethylhexedrone. And postal records showed that the same post office box had received at least eleven other packages from China and Hong Kong in a four-month period. Searches of his residences consistently yielded bulk inventories of *N*-ethylhexedrone and other controlled substance analogues together with shipping labels, packaging materials, scales, and other distribution paraphernalia. Finally, his ledgers reflected numerous transactions involving these substances. The pattern of repeated bulk procurement coordinated with downstream sales permits an inference of a mutual plan with upstream sources to import and redistribute contraband, not mere isolated buy-sell dealings. *See United States v. Dukes*, 139 F.3d 469, 475 (5th Cir. 1998).

At bottom, the Government was not required to produce an express agreement or identify the precise names of Shaughnessy's confederates. It was required to show that he knowingly furthered a shared plan to distribute controlled substances and their analogues—whether with anonymous platform operators or foreign suppliers. "[W]eighing the evidence in a light most deferential to the verdict rendered by the jury," the evidence permitted "a reasonable jury" to reach that conclusion beyond a reasonable doubt. *Hope*, 487 F.3d at 227.

B

We next address whether the district court erred by permitting testimony concerning Shaughnessy's dealings with the dark web vendor Gold to convert Bitcoin into United States currency. Shaughnessy concedes that our review is limited to plain error because his challenge is raised for the

first time on appeal. *United States v. Cervantes*, 706 F.3d 603, 616 (5th Cir. 2013).

Shaughnessy highlights a brief portion of Agent Samuels's direct examination describing Shaughnessy's difficulty liquidating his Bitcoin through traditional cryptocurrency exchanges and his subsequent dealings with Gold. During that exchange, the Government errantly mentioned the term "money laundering" in a general question about cryptocurrency exchange compliance mechanisms.[7] The court convened a sidebar and admonished counsel that the money laundering counts had been dismissed and demanded an explanation of the testimony's relevance. The Government explained that the testimony, although related to uncharged conduct, demonstrated the Bitcoin Shaughnessy liquidated through Gold were proceeds from the charged drug-trafficking conspiracies, which also explained why Shaughnessy could not transact with regulated cryptocurrency exchanges. The court allowed the evidence for this limited contextual purpose but directed the Government to avoid any reference to money laundering. Shaughnessy characterizes this testimony as, in substance, inadmissible character evidence barred by Federal Rule of Evidence 404(b). *See United States v. Meyer*, 63 F.4th 1024, 1040 (5th Cir. 2023).

At the outset, whether the testimony implicates Rule 404(b) turns on whether it was intrinsic to, or extrinsic from, the charged drug-trafficking conspiracies. *United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006) ("Rule 404(b) . . . only applies to extrinsic evidence and does not prohibit intrinsic evidence."). Evidence of other acts is intrinsic where "the evidence of the

_____

[7] Specifically, the Government asked Agent Samuels: "Okay, you mentioned BitCoin exchanges. Do they use software and have other procedures in place to combat money laundering?" *See* Hr'g Tr. Day 3, ECF-169, 114:7–9.

other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged.'" *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)). In other words, intrinsic evidence is "admissible to complete the story of the crime by proving the immediate context of events in time and place." *Id.* (citing *United States v. Kloock*, 652 F.2d 492, 494–95 (5th Cir. 1981)).

Notwithstanding the Government's errant mention of "money laundering," the evidence of Shaughnessy's Bitcoin-to-cash transactions was intrinsic to the charged drug-trafficking conspiracy because it illustrated how Shaughnessy converted his drug proceeds into cash. Agent Samuels testified that Shaughnessy arranged for thousands of dollars to be mailed to various addresses, often with no verifiable connection to him, and never provided documentation of lawful income. That Shaughnessy turned to Gold after being rejected by a traditional exchange for failing to verify the source of his funds strongly corroborated that the Bitcoin he was liquidating came from illegal activity on DWMs. Indeed, Agent Samuels testified that Shaughnessy's Bitcoin "originated one or two steps away" from a DWM.

By showing how Shaughnessy profited from and sustained his illegal enterprise, evidence of his dealings with Gold helped "complete the story" of the conspiracy and explained how the operation functioned in practice. *Coleman*, 78 F.3d 154, 156; *see also, e.g.*, *United States v. Valdez-Anguiano*, 91 F.3d 139, 1996 WL 400195 at *4 (5th Cir. 1996) (unpublished) (finding evidence of defendant's possession of $289,000 in $20 bills was intrinsic to a drug-trafficking conspiracy); *United States v. Mendez*, 643 F. App'x 418, 427 (5th Cir. 2016) (holding that a jury could reasonably find that $150,000 recovered during the traffic stop constituted proceeds of the drug conspiracy and was therefore intrinsic to the charged offense).

No. 24-10126

Because the challenged evidence was inextricably intertwined with the charged conspiracy and offered for a non-character purpose, Rule 404(b) is not implicated. The district court did not plainly err in allowing it.

C

We next consider whether the district court erred by admitting and allowing the Government to publish to the jury two uncharged videos depicting child pornography recovered from Shaughnessy's laptop. Because Shaughnessy preserved this objection, we review for abuse of discretion, subject to harmless error analysis. *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013) (citing *Coleman*, 78 F.3d at 156); *Cervantes*, 706 F.3d at 616 (citation omitted). A district court abuses its discretion if its ruling rests on "an erroneous view of the law or a clearly erroneous assessment of the evidence." *Kinchen*, 729 F.3d at 470–71 (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)). This standard is "heightened" when the challenged evidence is admitted under Rule 404(b), as evidence in criminal trials must be "strictly relevant to the particular offense charged." *Id.* at 470 (quoting *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003)).

Count Thirteen of Shaughnessy's indictment charged him with possession of three images depicting child pornography, which were admitted and published to the jury. The Government, however, moved to admit and publish two additional, uncharged videos of child pornography discovered in the same archive as the charged images to prove his knowledge of possession. Shaughnessy objected. Although the district court agreed the videos were subject to Rule 403, it overruled Shaughnessy's objection, finding them probative of his knowing possession of child pornography and that any prejudicial effect did not substantially outweigh their probative value. Still, the district court provided specific limiting instructions before their publication that the jury could not consider the videos as evidence

15

unless they found "beyond a reasonable doubt from other evidence in this case that Mr. Shaughnessy did commit the acts charged in the indictment." If so, the jury was permitted to consider the videos to determine (1) "whether Mr. Shaughnessy had the requisite state of mind or intent necessary to commit the offense charged in Count 13 of the indictment" and (2) "whether he had a motive or the opportunity to commit the acts charged in the indictment" and "acted according to a plan or in preparation for commission of a crime." The videos were admitted into evidence and viewed by the jury.

As a threshold matter, we will assume *arguendo* the at-issue videos were extrinsic evidence because the district court proceeded on that premise and admitted them under the more demanding Rule 404(b) standard. *See United States v. Hemphill*, 642 F. App'x 448, 452 (5th Cir. 2016) (assuming, without deciding, that evidence was extrinsic where the district court's ruling survived the more demanding Rule 404(b) analysis). The admissibility of the videos under Rule 404(b) turns on our two-step test announced in *United States v. Beechum*, which requires (1) they be relevant to a non-character issue and (2) their probative value not be substantially outweighed by unfair prejudice. 582 F.2d 898, 911 (5th Cir. 1978) (en banc). Shaughnessy accepts that the videos bore on non-character issues (*i.e.*, his knowledge of possession),[8] but maintains their "graphic and sadistic" nature rendered them unfairly prejudicial and tainted his defense. We disagree.

*First*, the two videos were not materially more inflammatory than the charged files. Each was less than 10 seconds and depicted a nude minor

---

[8] We have consistently upheld the admission of uncharged pornography depicting children or adults when it is, as here, relevant to the issue of the defendant's knowledge of possession. *See, e.g.*, *United States v. Layne*, 43 F.3d 127, 133–34 (5th Cir. 1995); *United States v. Goff*, 155 F. App'x 773, 776 (5th Cir. 2005); *United States v. Naidoo*, 995 F.3d 367, 378 (5th Cir. 2021).

female placing her fingers in her vagina and a minor child being penetrated by a male standing behind her. The three images listed in Count Thirteen of Shaughnessy's indictment consisted of a minor girl lying on her back, nude from the waist down, displaying her genitals; a nude minor girl with her legs spread and displaying her genitals; and a nude minor girl with an object inserted into her genitals. We cannot say the videos were of such "a different sexual nature from the photographs" that would render them "exceedingly prejudicial" because of their "inflammatory nature." *Cf. United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001) (contrasting charged child-pornography evidence that "depict[ed] no violence" from erroneously admitted extrinsic evidence describing "violent rapes and moderate torture" including "young girls in chains, a young girl in handcuffs, and references to blood"); *see also United States v. Caldwell*, 586 F.3d 338, 345 (5th Cir. 2009) ("*Grimes* is the exception, not the rule.").

*Second*, any potential prejudice was limited by the district court's careful screening of the evidence and a tailored limiting instructions to the jury. We have recognized that, although child-pornography evidence carries a risk of inflaming the jury, such risk is "tempered" when the court scrutinizes the Government's proffer and confines the jury's use of the evidence. *See, e.g.*, *United States v. Williams*, 250 F.3d 743 (5th Cir. 2001); *Naidoo*, 995 F.3d at 376; *Layne*, 43 F.3d at 134. Both safeguards were present here. Both before and during trial, the court scrutinized the videos and conferred with counsel at length regarding their content, the limited purposes of admission, and the danger of undue prejudice. It also issued a detailed limiting instruction cabining the jury's use of the evidence to knowledge, intent, motive, plan, or opportunity—and only if the jury first found, beyond a reasonable doubt from other evidence, that Shaughnessy committed the charged offense.

On balance, the district court acted within its discretion in admitting the two uncharged videos for the limited purposes identified.

D

We end with Shaughnessy's challenge to the district court's application of a five-level sentencing enhancement under U.S.S.G. § 2G2.2(b)(7)(D). We review "the application of the Guidelines de novo and the district court's factual findings—along with the reasonable inferences drawn from those facts—for clear error." *United States v. Landreneau*, 967 F.3d 443, 449 (5th Cir. 2020) (quoting *United States v. Gomez-Valle*, 828 F.3d 324, 327 (5th Cir. 2016)). "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Id.* (citation omitted). "The Government bears the burden of proving by a preponderance of the relevant and reliable evidence that the facts support a sentencing enhancement." *United States v. Rodriguez*, 523 F.3d 519, 524 (5th Cir. 2008).

Section 2G2.2(b)(7)(D) applies where an "offense involved 600 or more images" of child pornography and the Guidelines count each video as seventy-five images. *See* § 2G2.2 cmt. n.6(B)(ii). The district court applied the enhancement based on the conclusion of the Government's forensic analyst, Mr. Pircher, that Shaughnessy possessed fourteen images and eight videos depicting child pornography, or 614 total images. Shaughnessy maintains that the Government's own correspondence with NCMEC appeared to identify fewer qualifying files and that Mr. Pircher's age-assessment methodology at the sentencing hearing was insufficiently credible proof to apply the enhancement.

We conclude the district court did not clearly err in applying § 2G2.2(b)(7)(D). The enhancement rested on the PSR and the district court's on-the-record credibility determination after an extended colloquy with Mr. Pircher—findings to which we give substantial deference. *United*

*States v. Perez*, 217 F.3d 323, 331–32 (5th Cir. 2000); *United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996) ("Credibility determinations in sentencing hearings are peculiarly within the province of the trier of fact."). Mr. Pircher identified fourteen still images and eight videos on Shaughnessy's laptop that, in his opinion, depicted child pornography. In response to the court's probing, Mr. Pircher articulated concrete indicia such as body size and the absence of secondary sexual characteristics, including pubic hair, breast development, and hip development. He then applied those criteria file-by-file to the materials supporting the enhancement. The court also examined Mr. Pircher's training and prior experience in child-exploitation investigations. Finally, the arithmetic was undisputed: eight videos counted at seventy-five images each total 600 images, plus the fourteen images, resulting in a grand total of 614 images. That is comfortably above the 600-image threshold. § 2G2.2 cmt. n.6(B)(ii).

Shaughnessy's objections do not undermine that showing. He relies principally on two NCMEC-related communications with the Government noting that five images were identified as a "known series" of child pornography, which he reads as inconsistent with the larger tally. But the PSR addendum explained, and the communications themselves confirmed, that the "known series" label did not purport to classify all recovered files and "does NOT mean" the remaining images and videos were not child pornography. Indeed, the correspondence referenced many additional files that "may be child pornography" but were harder to classify. The district court could reasonably credit Mr. Pircher's file-specific determinations over the narrower scope of NCMEC's known-series notation.

Nor do Shaughnessy's methodological criticisms render Mr. Pircher's opinions unreliable. Shaughnessy emphasizes that Mr. Pircher admitted he was "not a doctor" and could not state the exact ages of the individuals depicted in the images and videos. But this simply underscores

that precise medical determinations were neither required nor made; what mattered were observable characteristics that the court tested through detailed questioning before crediting Mr. Pircher's file-by-file assessments. *See United States v. Cordy*, 560 F.3d 808, 817 (8th Cir. 2009) (finding no clear error in applying the enhancement where the court credited federal agent's testimony that he reviewed roughly 6,000 images and that most depicted child pornography despite occasional imprecision). Remaining assertions— that the analyst was combative or should have evaluated "facial features" differently—go to credibility and reliability, which the court was uniquely positioned to evaluate. *See Perez*, 217 F.3d at 331–32. Shaughnessy otherwise cites no authority showing these points make the finding implausible "in light of the record as a whole." *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008).

The district court's finding that the offense involved 600 or more images of child pornography is supported by "a preponderance of the relevant and reliable evidence," *Rodriguez*, 523 F.3d at 524, and its credibility judgments were well within its discretion.

### III

For the foregoing reasons, we AFFIRM the district court's judgment.